UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

THOSE CERTAIN INTERESTED UNDERWRITERS,
AT LLOYD'S, LONDON, subscribing to Policy No.
Z101663/003, as subrogee of M&C Ventures, LLC,
and Adirondack Sports Complex, LLC,
                          Plaintiff,

v.                                                    Lead Case: 1:12-CV-0707
                                                      (GTS/FRT)

THE FARLEY GROUP,
                          Defendant.
_____

THE FARLEY GROUP,
                          Third-Party Plaintiff,

v.

TADJER-COHEN-EDELSON ASSOCIATES, INC.,
                          Third-Party Defendant.
_____

M&C VENTURES LLC; and ADIRONDACK
SPORTS COMPLEX, LLC,
                          Plaintiffs,

v.                                                    Member Case: 1:13-CV-385
                                                      (GTS/FRT)

THE FARLEY GROUP,
                          Defendant.
_____

THE FARLEY GROUP,
                          Third-Party Plaintiff,

v.

TADJER-COHEN-EDELSON ASSOCIATES, INC.,
                          Third-Party Defendant.
_____

APPEARANCES:                                  OF COUNSEL:

FURMAN KORNFELD & BRENNAN, LLP      ANDREW R. JONES, ESQ.
  Counsel for Plaintiff Those Certain
  Interested Underwriters at Lloyd's, London
61 Broadway, 26th Floor
New York, New York 10006

BAXTER, SMITH & SHAPIRO, P.C.             ARTHUR J. SMITH, ESQ.
  Counsel for Defendant                       STEVEN M. BUNDSCHUH, ESQ.
99 North Broadway
Hicksville, New York 11801

FITZGERALD MORRIS BAKER FIRTH, P.C.    JOHN D. ASPLAND, JR., ESQ.
  Counsel for Plaintiffs Adirondack          JOSHUA D. LINDY, ESQ.
  Sports Complex and M&C Ventures, LLC
16 Pearl Street
P.O. Box 2017
Glens Falls, New York 12801

GLENN T. SUDDABY, Chief United States District Judge

I.  RELEVANT BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.  The Underwriters' Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.  The Complaint Filed by M&C and ADSC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C.  Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.  Statement of Undisputed Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

  1.  Plaintiffs' Claims and Relevant Background. . . . . . . . . . . . . . . . . . . . . . . 4

  2.  Mr. Miller's Decision to Purchase a Farley Dome. . . . . . . . . . . . . . . . . . . 5

  3.  Farley Contract and Warranties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

  4.  Design of the ADSC Dome. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

  5.  TCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

  6.  Farley's Design of the ADSC Dome. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

  7.  Erection of the ADSC Dome. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

  8.  Operation and Maintenance of the ADSC Dome.. . . . . . . . . . . . . . . . . . . 20

  9.  Air Pressure Fluctuation of the Dome to Remove Snow. . . . . . . . . . . . . . 24

  10. Temperatures Inside the ADSC Dome.. . . . . . . . . . . . . . . . . . . . . . . . . 26

  11. Events Preceding the Dome's Partial Collapse. . . . . . . . . . . . . . . . . . . . 27

  12. Events Post-Collapse of the ADSC Dome. . . . . . . . . . . . . . . . . . . . . . . 33

  13. Damage Caused by the Dome's Collapse. . . . . . . . . . . . . . . . . . . . . . . . 35

E.  Parties' Briefing on Defendant's Motion for Summary Judgment. . . . . . . . . . . 38

  1.  Defendant's Memorandum of Law-in-Chief. . . . . . . . . . . . . . . . . . . . . . 38

  2.  Underwriters' Opposition to Defendant's Motion for Summary
      Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

  3.  ADSC's Opposition to Defendant's Motion for Summary Judgment. . . . 43

  4.  Defendant's Reply to Plaintiffs' Respective Oppositions to the Motion for
      Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

  5.  Underwriters' Sur-Reply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

  6.  ADSC's Sur-Reply.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

  7.  Defendant's Sur-Sur-Reply to Plaintiffs' Sur-Replies. . . . . . . . . . . . . . . 51

II. APPLICABLE LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

III. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

A.  Whether the Economic Loss Rule Bars Plaintiffs' Tort Claims. . . . . . . . . . . . . 54

  1.  "Abrupt Cataclysmic Occurrence". . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

  2.  "Other Property". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

  3.  Negligent Misrepresentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

  4.  Independent Duty of Care. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

  5.  Failure to Warn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

B.   Whether the Limitation-of-Liability Provision Precludes Consequential
     Economic Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
     1.   Whether the Subject Contract Is Unconscionable. . . . . . . . . . . . . . . . . . 69
     2.   Whether Public Policy Prohibits Enforcement of the Limitation-of-
          Liability Provision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
C.   Whether Underwriters' Claims for Breach of Implied and Express
     Warranties and Breach of Contract Are Barred by the Statute of Limitations.. . . 74
     1.   Whether the Parties' Contract Is One for the Sale of Goods. . . . . . . . . . 74
     2.   Accrual and Application of Statute of Limitations to Underwriters'
          Breach-of-Warranty Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
D.   Whether Underwriters' Claim for Defective and/or Negligent Design of the Dome
     Is Barred by the Statute of Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
E.   Whether a Genuine Dispute of Material Fact Exists Regarding Underwriters'
     Claim for Defective and/or Negligent Design of the Dome. . . . . . . . . . . . . . . . 86
F.   Whether a Genuine Dispute of Material Fact Exists Regarding Underwriters'
     Claim for Failure to Warn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
G.   Defendant's Challenge to the Admissibility of Thomas Grafe's Expert
     Opinions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

<u>**DECISION and ORDER**</u>

Currently before the Court, in these consolidated property damage actions filed by M&C Ventures, LLC ("M&C"), Adirondack Sports Complex, LLC ("ADSC") (collectively "ADSC"), and Those Certain Interested Underwriters at Lloyd's, London, subscribing to Policy No. Z101663/003, as subrogee of M&C and ADSC (hereinafter "Underwriters"), against The Farley Group ("Farley" or "Defendant"), is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 56.)  For the reasons set forth below, Defendant's motion is granted in part and denied in part.

## I.    RELEVANT BACKGROUND

### A.    The Underwriters' Complaint

The Underwriters filed their Complaint on April 30, 2012, in their capacity as subrogee of M&C. (Dkt. No. 1.)  Generally, the Complaint alleges as follows.  M&C is the owner of the Adirondack Sports Complex, located in Queensbury, New York, which is a multi-sport and event facility operated by ADSC. (*Id*. ¶ 1, 7.)  The Underwriters provided insurance coverage to M&C against property damage to its buildings in connection with M&C's operation of the sports complex. (*Id*. ¶ 2.)  The sports complex is enclosed by a dome that was manufactured by Defendant in August of 2005, installed by Defendant sometime in November of 2005, and has continued to be serviced and maintained by Defendant.  (*Id.* at ¶ 8.)

During the winter of 2006, the dome began having technical and mechanical problems with its longitudinal cables (cables that run over the top of the dome lengthwise and provide support for its "end caps").  (*Id.* at ¶ 9.)  Specifically, snow began to slide down to the outer most cable on each side, causing a back up of snow on the dome, which resulted in sagging in the

dome's southeastern areas and required the dome's air pressure to be kept at a higher level to maintain its structure.  (*Id.*)  ADSC notified Defendant of the accumulation of ice and snow in these areas in an attempt to develop a better method for causing accumulated snow to slide over the cable and off the side of the dome.  (*Id.* at ¶ 11.)  Defendant advised ADSC to implement a "pressure control" method of decreasing the air pressure of the dome as a means of dislodging snow accumulation from the dome's roof.  (*Id.* at ¶ 13.)  This method initially worked with some success.  (*Id.* at ¶ 16.)  However, due to significant snowfall and exceptionally cold temperatures during the winter of 2010-2011, the dome did not experience a normal shedding of snow.  (*Id.* at ¶ 17.)

In February 2011, approximately eight inches of snow fell in the area of Queensbury.  (*Id.* at ¶ 19.)  To remove the excess snow, Defendant advised ADSC to take a length of rope and run it along the dome to dislodge the accumulated snow.  (*Id.* at ¶ 20.)  On February 5, 2011, the dome's roof began to invert under the weight of the accumulated snow and ice.  (*Id.* at ¶ 21.)  ADSC successfully used a recirculation unit to round out the dome to expel snow and ice from the dome's roof.  (*Id.* at ¶ 22.)  The next day, on February 6, 2011, ADSC contacted Defendant and advised that some of the snow had been dislodged from the dome.  (*Id.* at ¶ 24.)  However, that same night, ADSC attempted to increase the pressure of the Dome, with no success.  (*Id.* at ¶ 25.)  ADSC spoke with Defendant's representatives, who advised that reducing the pressure in the dome may cause the snow/ice to dislodge.  (*Id.*)  ADSC followed this advice and lowered the pressure, which caused large portions of snow/ice to shift to one area.  (*Id.* at ¶ 26-28.)  Moments later, a large portion of the dome collapsed to the ground.  (*Id.* at ¶ 29.)  This incident required the dome to be completely deflated so that it could be repaired.  (*Id.* at ¶ 30.)  As a result, Underwriters paid $933,642.80 to M&C under its insurance policy for the damage sustained to the dome.

Based on these factual allegations, the Underwriters' Complaint asserts five claims against Defendant: (1) a claim that Defendant is strictly liable for the defective design of the dome; (2) a claim that Defendant negligently designed the dome; (3) a claim that Defendant failed to warn M&C and ADSC about the dangers from the foreseeable uses of its product; (4) a claim that Defendant breached its duty of reasonable care by advising ADSC to remove accumulated snow and ice by employing failed techniques and otherwise providing inadequate and/or improper instructions on how to effectively handle the situation and failing to timely respond to M&C's requests for assistance; and (5) a claim that Defendant breached its implied and express warranties to M&C. (*Id.* ¶¶ 34-60.)

### B. The Complaint Filed by M&C and ADSC

M&C and ADSC filed their Complaint on April 4, 2013. (12-CV-0707, Dkt. No. 1.) On April 17, 2013, an Order was entered by United States Magistrate Judge Randolph F. Treece, which consolidated this matter with the action commenced by Underwriters. (Dkt. No. 7.) Pursuant to this Order, this matter was designated as the Lead Case (12-CV-0707) and the action commenced by Underwriters (13-CV-0385) was designated as the Member Case. (*Id.* at 2.)

Generally, the Complaint filed in the Lead Case asserts identical claims and factual allegations as those asserted in the Member Case. (Dkt. No. 1, ¶¶ 2-29.) Accordingly, for purposes of brevity, the Court will not restate these claims and allegations. However, in addition to the claims already discussed, the Complaint in the Lead Case also asserts a sixth claim for breach of contract. (*Id.* ¶ 59.) Specifically, this claim alleges that, pursuant to the contract between the parties, Defendant warranted that "the air structure package supplied as per items 1-6 will perform satisfactorily at this location for the intended use." (*Id.*) M&C and ADSC claim that the product provided by Defendant "did not conform to the contract and did not perform satisfactorily at the location for the intended use." (*Id.*)

Familiarity with these claims, and the factual allegations supporting them, is assumed in this Decision and Order, which is intended primarily for the review of the parties.

### C. Procedural History

A stipulation of dismissal of the third-party claims against Third-Party Defendant, Tadjer-Cohen-Edelson Associates, Inc. ("TCE"), in both the Lead and Member Cases, was signed by both Farley and TCE and filed on August 12, 2014. (Dkt. No. 84.)

### D. Statement of Undisputed Material Facts

The following material facts have been asserted and supported by Defendant in its Statement of Material Facts, and not denied in a matching numbered paragraph with a supporting record citation by either Underwriters or M&C and ADSC in their responses thereto, and thus admitted pursuant to Local Rule 7.1 of the Local Rules of Practice for this Court. (*Compare* Dkt. No. 57 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 67 [Underwriters' Rule 7.1 Response]; Dkt. No. 69, Attach. 7 [Pls.' Rule 7.1 Response].)

### 1. <u>Plaintiffs' Claims and Relevant Background</u>

1. Plaintiffs allege that an air structure designed and manufactured by Farley, which was installed by Farley, M&C, and ADSC in Queensbury, New York, in November 2005 partially collapsed due to the weight of ice and snow on February 6, 2011.


2. Plaintiffs allege that Farley defectively and/or negligently designed the dome, that Farley failed to warn and/or provide adequate instructions for the use of its product, that Farley gave negligent advice regarding the operation of the dome, and that Farley breached the contract of sale and/or implied and express warranties for the subject air structure.

3.      Underwriters are seeking monetary damages in the amount paid to its insured pursuant to a policy of insurance.  M&C and ADSC are seeking monetary damages for business interruption and default fees and interest on business loans.

4.      Doug Miller is a principal of both M&C and ADSC.  M&C is the single purpose entity formed to own real property located at 326 Sherman Ave, Queensbury, New York, including the air-supported structure (a/k/a dome) erected thereon.  ADSC manages and operates a multi-sport and event dome for indoor and outdoor field sports and community events located at 326 Sherman Ave, Queensbury, New York.

5.      Mr. Miller is college educated with degrees in physical education, sports medicine and mechanical engineering.  He also has a post-graduate degree in sports medicine.  Mr. Miller has an employment background in education and coaching as well as general construction, mechanical construction and design.

6.      In or around 1999, Farley began designing and manufacturing air-supported structures.  Farley has designed and manufactured domes installed throughout North America and in Russia, off the coast of Siberia, and China.

7.      Farley has designed and manufactured approximately three hundred domes since 1999.  Most of these domes are located in areas with similar climates to that of Queensbury, New York.

8.      Currently, Farley's main competitors are Yeadon, Arizon and ASATI.

2.      **Mr. Miller's Decision to Purchase a Farley Dome**

9.      Mr. Miller became interested in owning and operating an air-supported sports facility in the early 2000s while coaching youth athletics at dome sports facilities in other locales.  He visited approximately three (3) domes prior to 2003.

10.     Farley became involved with ADSC when Doug Miller contacted John Simpell, a representative from Farley, expressing interest in erecting a multi-purpose sports dome in Queensbury, New York.

11.     Mr. Simpell was involved in sales for Farley when Mr. Miller first became interested in purchasing a dome.  Mr. Simpell was involved in the sale of the ADSC dome.

12.     Between 2002 and 2005, Mr. Miller visited approximately thirty (30) domes. These domes were located primarily on the east coast of the United States and in Canada.  Mr. Miller visited domes manufactured by Farley, Yeadon, ASATI and Birdaire between 2000 and 2005.

13.     During this time period, Mr. Miller visited domes installed in Ontario, Canada, Connecticut, New Hampshire and New York, including those located in cold weather climates such as Buffalo, Niagara Falls, and Albany with representatives of Farley, Yeadon and ASATI. (*Compare* Dkt. No. 57, ¶ 13 [Def.'s Rule 7.1 Statement, citing record evidence that establishes above-stated fact, which does not state that the climates of these geographic areas are "similar" to that of Queensbury, NY, as ADSC contends] *with* Dkt. No. 69, Attach. 7, ¶ 13 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

14.     During his many visits to domes, Mr. Miller spoke with the owners, operators and managers regarding the operation, maintenance and design of their domes.

15.     During his visits to other domes, Mr. Miller was never advised by dome owners, operators or managers that they had issues with the ability of Farley domes to shed snow. However, these discussions mostly involved the accumulation of snow on the ground level and the prevention of snow from accumulating against a dome's grade beam rather than the prevention of snow from accumulating on top of a dome.

16.     Mr. Miller had dozens of communications with Yeadon before deciding which dome to purchase.  In addition, he visited approximately twelve (12) of their domes.

17.     Domes manufactured by Yeadon had the same or a substantially similar exterior cross-cable system to domes manufactured by Farley.

18.     Mr. Miller had more than fifty (50) conversations with representatives from Farley before deciding to purchase a Farley dome.  Mr. Miller visited at least fourteen (14) Farley domes before purchasing a Farley dome, including Farley's manufacturing facility in Guelph, Ontario, which was housed in a Farley dome.

19.     When Mr. Miller was deciding to purchase a dome, his main concerns were the up-front costs as well as operating costs such as the dome's energy consumption and thermal efficiency.

20.     The up-front costs of an air-supported structure are three (3) to five (5) times less than those of a conventional metal building lacking column support.

21.     Both Yeadon and Farley provided documents containing the estimated energy consumption and operating costs for their domes because that information was a key part of Mr. Miller's decision making.

22.     Ultimately, Mr. Miller decided to purchase a Farley dome as opposed to a dome manufactured by Yeadon, ASATI and Birdaire. Yeadon and Farley domes were similarly priced and designed; however, he preferred the type of insulation used by Farley in its domes based on the insulation's thermal efficiency.

23.     During his pre-purchase research, Mr. Miller came to learn that the ASATI dome design resulted in additional challenges with snow.

24.     Mr. Miller was informed by both representatives of Yeadon and Farley that their domes were designed to shed snow–not to hold the weight of snow.  He understood that, due to the cabling pattern and Tedlar fabric, the domes designed by Yeadon and Farley had better snow shedding capabilities than did ASATI domes.  Mr. Miller was made aware that snow entrapment could occur as a result of the exterior cables.  Snow entrapment was reduced by the cabling design used by Yeadon and Farley.

25.     Mr. Miller was able to choose which fabric the dome would be constructed from; and he chose the Tedlar fabric based on discussions with Farley and the Tedlar's longer life span and increased snow shedding ability.

26.     Mr. Miller performed extensive research into domes before purchasing the dome manufactured by Farley.

27.     Mr. Miller also relied upon Farley's track record and design capabilities as well as information ascertained while visiting other domes and speaking with dome owners, operators and managers about the maintenance issues and operation of their domes.

28.     Mr. Miller also spoke with other dome owners, operators and managers about the dimensions of their domes and how those dimensions affected snow build-up on their domes. These discussions ultimately resulted in Mr. Miller reducing the width of the dome he intended to have constructed by Farley.

29.     Mr. Miller was aware that the dimensions of the dome also had an impact on the number of exterior support cables necessary to structurally support the dome. (*Compare* Dkt. No. 58, Attach. 11, at 612:14-22 [cited in ¶ 29 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 29 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

3. **Farley Contract and Warranties**

30. After discussions and negotiations, ADSC and Farley entered into a contract for the purchase of a Farley dome. At his deposition, Mr. Miller identified the contract between ADSC and Farley as well as his signature on the contract.

31. Mr. Miller received a pre-printed Farley warranty before the execution of the contract.

32. Mr. Miller may have received the pre-printed warranty bearing exhibit tab "3B," but had the pre-printed warranty bearing exhibit tab "19" with his records.

33. Both the warranty bearing exhibit tab "3B" and the warranty bearing exhibit tab "19" contained a limitation of liability provision stating that "[Farley] shall not be liable in contract or tort (including negligence) for loss of profits or revenues, loss of use of equipment or facilities, cost of capital, or for any nature resulting from or in any manner relating to the air supported structure covered hereby, its design, use, any inability to use the same or any delay in delivery of same."

34. Mr. Miller understood that Farley's warranty was made a part of the contract at the time of the contract's execution.

4. **Design of the ADSC Dome**

35. ADSC retained Tom Nace to provide site development engineering services. ADSC retained Rucinski Hall, an architecture firm, to design the support building and the electrical system that supplies power to the dome, and to file necessary documents, calculations and drawings with the local building department.

36. Jason Schmidt is the Vice President of Design and Technical Solutions at Farley.

37.     Mr. Schmidt was the Farley employee involved with designing the dome.

38.     The dome was designed in accordance with the ASI-77, which is the industry standard for designing air-supported structures in the U.S.  (*Compare* Dkt. No. 57, ¶ 38 [Def.'s Rule 7.1 Statement, supporting above-stated factual assertion with accurate record citation] *with* Dkt. No. 69, Attach. 7, ¶ 38 [Pls.' Rule 7.1 Response, failing to support denial with citation to specific paragraph(s) of Grafe's affidavit, which in any event appears based on lack of personal knowledge, speculation and/or argument regarding the *design* of the dome in *2005*].)

39.     The ASI-77 is the standard required by the 2002 New York State Building Code with respect to designing air-supported structures.

40.     While the largest dome Farley had built, the ADSC dome was similar to other domes designed and manufactured by Farley in that it had an outer membrane and inner membrane as well as longitudinal and barrel cables on the exterior of the dome.

41.     Mr. Schmidt prepared a set of construction drawings and load calculations, which did not include snow load calculations, but which were approved by ADSC and sent to Tadjer-Cohen-Edelson Associates, Inc. ("TCE") for review and certification.

42.     TCE reviewed and stamped the design drawings and calculations.

43.     TCE would review the drawings and calculations in an effort (whether successful or not) to ensure that they were compliant with the local code.

44.     Load calculations affect the location, diameter and amount of barrel and longitudinal cables required to support the dome.  The cables are necessary to reduce the stress in the fabric caused by loading due to wind and air pressure.  The cables help provide the required curvature to aid in fabric stress reduction.  Longitudinal and barrel cables are required to ensure

that the dome fabric has an adequate safety factor and does not tear apart. The longitudinal and barrel cables also hold the dome in place and prevent it from lifting up.

     **5.**    **TCE**

45.     Ali Tahbaz is a Professional Engineer licensed in New York, Maryland, Virginia and the District of Columbia and a principal of TCE.

46.     TCE has provided structural engineering services in connection with air-supported structures since 1995. It has provided structural engineering services for Yeadon and Farley.

47.     TCE has provided structural engineering services on approximately 150 air-supported structures manufactured by Yeadon and erected in the U.S. TCE has provided structural engineering services on approximately thirty (30) to thirty-five (35) air-supported structures manufactured by Farley.

48.     Between 1995 and 2005, TCE had provided structural engineering services on at least 100 air-supported structures. Of those 100 or more domes, approximately thirty (30) to thirty-five (35) were to be erected in New York.

49.     In 2005, Rick Edelson, Vice President of TCE, was a Professional Engineer licensed in New York.

50.     Mr. Tahbaz would personally review the calculations and drawings for domes erected in New York between 1998 and 2005 under the supervision of Mr. Edelson.

51.     Mr. Tahbaz was Farley's principal contact. He was advised in 2005 that Farley was planning to design a dome for erection in Queensbury, New York.

52.     Design drawings and calculations were provided by Farley in connection with the air-supported structure to be erected in Queensbury, New York. Mr. Tahbaz reviewed all the calculations for accuracy and to make sure that the dome as designed was structurally sound.

53.     In addition, Mr. Tahbaz reviewed this information to determine whether compliance with the 2002 New York State Building Code was met.

54.     Mr. Tahbaz reviewed the calculations and drawings and did not take exception to those calculations or drawings.  (*Compare* Dkt. No. 57, ¶ 54 [Def.'s Rule 7.1 Statement, citing record evidence that establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 54 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

55.     Mr. Tahbaz also reviewed Farley's Operating and Maintenance Instructions in conjunction with the calculations, drawings and ASI-77.

56.     TCE had never been asked to review snow load calculations on any of the 150 air-supported structures that it provided structural engineering services on for either  Farley or Yeadon.

57.     Snow load calculations were never requested by TCE.  The domes designed by Yeadon and Farley were designed in accordance with ASI-77.

**6.      Farley's Design of the ADSC Dome**

58.     When designing the dome, Farley considered wind loads and outdoor temperatures.  (*Compare* Dkt. No. 58, Attach. 18, at 38:6-39:4; 40:10-19 [cited in ¶ 58 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 58 [Pls.' Rule 7.1 Response, failing to cite record evidence establishing that Mr. Schmidt was not aware of climatic data in 2005 when the dome was designed].)

59.     Snowfall and heat loss rates were considered in determining the size and output of the heating system.

60.     The ASI-77 does not provide formulas for determining snow loads.  (*Compare* Dkt. No. 58, Attach. 18, at 235:9-20 [cited in ¶ 60 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 60 [Pls.' Rule 7.1 Response, which cites ASI loading combinations but not formulas for determining snow loads].)

61.     While two of Farley's competitors (ASATI and Arizon) often design for snow loads, it is not standard industry practice to design for snow loads; rather, industry practice is to use heat as a tool in aiding the dome in shedding snow.  (*Compare* Dkt. No. 58, Attach. 18, at 90:21-91:3 [cited in ¶ 61 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 3 [cited in ¶ 61 Pls.' Rule 7.1 Response, which establishes only that ASATI and Arizon design domes to withstand certain snow loads].)

62.     Heat inside the dome is a factor that aids the dome in shedding snow.

63.     While air-supported structures may temporarily hold six to twelve inches of fresh snow (before the snow is shed), they are not designed to support the weight of snow but are designed to shed snow.  There is a design distinction between conventional buildings and air-supported structures.

64.     Farley domes, including the ADSC dome, are designed with various attributes to aid them in shedding snow.  The curvature of the dome and its flexibility in wind aids in the dome's ability to shed snow.  In addition, heating the dome and increasing air pressure also aid in preventing snow accumulation and shedding snow that has accumulated.  The slipperiness of the Tedlar fabric also aids the dome in shedding snow.  Lastly, while neither the dome's design drawings nor its operating manual mention manual removal, and Farley may not have mentioned manual removal until approximately five years after the dome's construction, the dome is designed in such a way that snow may be removed from it manually by pulling a rope over the top of it.

65. Tedlar fabric is considered the slipperiest in the industry.

66. Because the ADSC dome was designed in accordance with ASI-77, the dome did not need to be designed to support the ground snow loads of any specific geographic area. It was designed so that snow could be removed through the application of internal heat or manually. (*Compare* Dkt. No. 58, Attach. 21, at 119:12-24 [cited in ¶ 66 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 66 [Pls.' Rule 7.1 Response, which fails to cite record evidence establishing that ASI-77 requires a design to account for snow loads of specific geographic locations where a dome is to be erected].)

67. By at least November 15, 2010, Mr. Miller was made aware that manual removal of snow could be required if snow was allowed to accumulate on the dome. (*Compare* Dkt. No. 58, Attach. 30, at p. 1 [cited in ¶ 67 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 67 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

68. Because snow load is borne by inflation pressure, the amount of snow that accumulates on the top of the structure cannot be more than the internal air pressure of the structure.

69. The turf was not something that came with the dome; rather, it was something ADSC purchased separately. (*See* Dkt. No. 57, ¶ 69 [Def.'s Rule 7.1 Statement, citing record evidence that establishes above-stated fact].)

70. Farley provided supervisory personnel for the erection of the dome. ADSC provided the labor for the erection of the dome.

71.    The mechanical equipment was installed outside of the dome and air was forced into the dome through the ducts.

72.    The mechanical equipment provided by Farley included a main inflation unit, which is the primary air and heat source for the dome, as well as the re-circulation unit, which re-circulates the indoor air and provides heat for the dome.  Farley also provided and installed a low-inflation unit, which is an emergency unit, and a summer fan, which is used in the warmer months to bring in outside air.

73.    The dome also had furnaces, which transported forced air through ground level ducts and heated the interior of the dome.

74.    The furnaces were sized so that they provided 3.5 billion BTUs for heat.  Farley chose that output because it provided a 500,000 BTU buffer in excess of the desired normal operating temperature.  This would produce at least 65°F at ground level in the dome if the outside temperature was 0°F.

75.    The ADSC dome designed by Farley included insulation.  The insulation increases the thermal resistance of the air structure membrane to reduce heating costs.  Heat is reflected into the dome.  However, there is still heat loss.  The lower the R value, the quicker the heat will pass through the insulation.

76.    Due to stratification, heat in a dome will rise to the top resulting in higher temperatures at the top of the dome.  Heat stratification aids a dome in melting snow.

77.    The insulation was intended to slow down, but not stop, heat from escaping to melt snow.

78. Insulation is used as a cost saving measure because it reduces the size of the furnace required to heat the dome and saves energy costs. Adding insulation was an option, which ADSC chose for that purpose.

79. Most customers request the insulation in order to save energy costs. Insulation has never been an issue in preventing Farley domes from shedding snow.

80. Mr. Miller had frequent discussions with Jason Schmidt, Farley's dome designer, regarding the design and location of mechanical systems in the dome and the positioning of longitudinal cables and their connection to the support building. ADSC's architect was also involved in those discussions. Mr. Miller was aware that Mr. Schmidt was not an engineer and understood that design drawings and calculations would be sent to a licensed professional engineer for review and approval.

81. Mr. Miller was also involved in the design of the duct work providing forced air into the dome for heat and air pressure.

82. During the design phase, Mr. Miller requested certain changes to the grade beam design and duct work specifications. There were also some requested changes with respect to the building connection.

83. ADSC's architect filed the stamped engineering drawings and calculations for the dome with the local municipality.

84. Mr. Miller initially wanted a dome that was larger than any manufacturer had made at that time. Ultimately, it was decided between Farley and ADSC that the dome's size would be reduced.

85. After submission of the certified drawings and calculations, the local municipality requested snow load calculations, which Mr. Schmidt prepared based on formulas used by Yeadon and information provided in the ASI-77 and ASCE 7-98.

86. Before the project in question, Farley had rarely, if ever, provided a client with snow load calculations on an Excel spreadsheet for a project. (*See* Dkt. No. 58, Attach. 18, at 60:8-20 [cited in ¶ 86 of Def.'s Rule 7.1 Statement, which establishes above-stated fact].)

87. The ground snow load refers to the amount of snow that can accumulate at a location if a building was not there.

88. When Farley prepared the snow load calculations for the local municipality, the preparation was solely for the purpose of determining the snow load that the air-supported structure could handle given its design. It was not prepared as part of the design process.

89. The snow load calculations were not reviewed by a licensed engineer, and the building department neither requested any changes to the design of the dome to meet a specified snow load criteria nor requested calculations certified by a licensed professional engineer. (*Compare* Dkt. No. 58, Attach. 19, at 253:254:5, 286:13-287:7, 289:7-14 [cited in ¶ 89 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, at ¶ 89 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

90. Mr. Schmidt corresponded with the local municipality after submitting the requested snow load calculations. He advised the local building department and Mr. Miller that the snow load calculations did not account for the effect that internal heat would have on the dome. He advised the local building department and Mr. Miller that Farley recommends to all its customers to keep their heat on during heavy snow storms or if there is a risk of a potential heavy snowfall during non-operating hours.

91.     Mr. Schmidt also prepared the patterning drawings for the dome membrane.  The patterning drawings would be provided to the factory floor for welding of the dome fabric.

92.     The length of the barrel and longitudinal cables would be determined by Mr. Schmidt while patterning the dome.

93.     Adam Spencer currently holds the title of Production and Service Manager at Farley.

94.     Mr. Spencer was involved in the fabrication of the dome.  Fabrication of the dome consists of cutting and welding the fabric together per the pattern drawings created by Jason Schmidt.

## 7.     Erection of the ADSC Dome

95.     The dome's erection began on or about November 25, 2014.

96.     Mr. Spencer was the site supervisor for the erection of the dome.  Farley had a four-person crew that included Sam Hayhoe.

97.     Temporary labor was provided by ADSC for the actual erection of the dome.  There were approximately forty (40) laborers involved in the erection of the dome.

98.     The erection of the dome was completed in approximately three weeks.  After the dome was up, Farley installed insulation and lights.

99.     Daily work orders were prepared by Farley and reviewed and executed by Mr. Miller.

100.     While Mr. Spencer is not absolutely certain of the fact, he believes that, after erection of the dome was substantially complete, he performed a walk-through with Mr. Miller for turnover.  Further, Mr. Spencer believes that any deficiencies were noted to be completed or

corrected under warranty at a later date. Mr. Spencer believes that he discussed general operation procedures including the general procedures outlined in the owner's manual related to heat and pressure. Finally, he believes that he also discussed operation of the dome with respect to snow. (*See* Dkt. No. 57, ¶ 100 [Def.'s Rule 7.1 Statement, citing record evidence that establishes above-stated fact].)

101.    Mr. Miller executed the acknowledgment of receipt of goods at the time of turnover, which was December 9, 2005.

102.    Mr. Miller did not refuse to accept the dome after it was installed or inform Farley that he and/or ADSC believed that the dome as designed, manufactured or installed was in breach of the contract. However, there were items that had to be completed, repaired or replaced after the initial erection.

103.    Craig Vandenberg is the Vice President of Mechanical Design.

104.    Mr. Vandenberg was involved in the installation of mechanical equipment in the dome.

105.    The dome has two heating units, each with 1.75 million BTU heat output. The units are located outside the dome and feed heated forced air into the dome through ducts in the ground. The heated air rises from vents in the ground inside the dome.

106.    Mr. Vandenberg wired the mechanical equipment. He performed the start-up of the air inflation equipment and trained Mr. Miller on how to use it.

107.    Mr. Vandenberg visited the dome several times thereafter for warranty work and customer relations purposes. He would discuss the mechanical equipment and its operation during those visits and perform inspections. He would also answer any questions that Mr. Miller had.

108.    Mr. Vandenberg completed the wiring of the heating control system on or about March 27, 2006.  At that time, he trained Mr. Miller on how to use it.

109.    Mr. Vandenberg testified that, every time he visited the dome, the heat was off.

110.    Other than Mr. Miller, only Andrea Eaves was a full-time ADSC employee at the time that the dome was erected.

### 8.    Operation and Maintenance of the ADSC Dome

111.    The day-to-day operation and maintenance of the dome and its mechanical support systems is wholly Mr. Miller's responsibility and has been since the time of its erection.

112.    Farley was never retained to perform routine maintenance, service or inspections of the dome.  After the dome was erected, Farley visited the dome one to two times per year when called to perform warranty work.

113.    ADSC did not enter into a service agreement with Farley.  (*Compare* Dkt. No. 58, Attach. 8, at 244:11-12 [cited in ¶ 113 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, at ¶ 113 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

114.    ADSC was first provided with the Operation and Maintenance Instructions in 2004 when Mr. Miller was determining whose dome to purchase.

115.    Through visiting other domes with Farley representatives over the course of three years, Mr. Miller learned about the operation and maintenance of the dome through Farley representatives and other dome owners, operators and managers.  Mr. Miller had several discussions and site visits to other domes where the substance of the information contained in the Operation and Maintenance Instructions was discussed.

20

116.    Mr. Miller did not request formal training and did not ask Farley representatives any specific questions regarding the contents of the Operation and Maintenance Instructions.

117.    Mr. Miller read the section in the Operation and Maintenance Instructions under the heading "Snow Accumulation."  He never contacted Farley with any questions regarding the substance of that paragraph. He also read the section titled "Emergency Procedures."  He understood the directions in the operator's manual.  (*Compare* Dkt. No. 58, Attach. 7, at 177:9-180:6 [cited in ¶ 117 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, at ¶ 117 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

118.    Mr. Miller understood that the application of heat through the heating system in the dome was a necessary component in melting snow that accumulated on the dome.

119.    Mr. Vandenberg had instructed Mr. Miller that the heat must be turned to 75°F prior to, during, and after snow events and kept on continuously until the snow melts off the air-supported structure.  (*Compare* Dkt. No. 58, Attach. 20, at 71:17-25, 77:11-78:4, 241:9-243:2 [cited in ¶ 119 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, at ¶ 119 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

120.    On several occasions other Farley personnel either verbally or in writing instructed Mr. Miller to apply heat to combat the accumulation of snow on the air-supported structure.

121.    Prior to the erection of the dome, Mr. Miller was made aware that the use of heat would aid the dome in shedding snow by providing a melt layer to facilitate the sliding of snow

off the dome.  Mr. Miller had also reviewed correspondence between Farley and the local municipality before the erection of the dome where Farley's dome designer indicated that the application of interior heating should be used to aid in shedding snow.

122.     Before the dome's erection, Mr. Miller was never made aware by Farley that the air structure was not designed to support 70 PSF of ground snow loads but, rather, was advised by Farley that the dome was designed to shed snow with the use of internal heat and air pressure.

123.     Mr. Miller observed that the ADSC dome did, in fact, shed snow.  The use of the Tedlar fabric aided the dome in shedding snow; the curvature of the dome aided the dome in shedding snow; the use of air pressure aided the dome in shedding snow; and using heat in the dome and transferring the heat through the fabric aided the dome in shedding snow.

124.     Before the subject collapse, the dome had effectively shed snow during past winters.  ADSC sent out a press release that stated specifically that, up until the date of the collapse, the dome had effectively shed snow during winter months since its erection.

125.     ADSC experienced that snow normally shed off the dome without any human intervention.

126.     When snow was forecasted, ADSC did not always keep the heat on.  It depended on the amount of snow forecasted, the type of snow expected, and the likelihood of a snow storm occurring.

127.     Mr. Miller believed that the volume of snow, in terms of its effect on the dome, was only one of many variables ADSC needed to consider when deciding whether to use internal heat prior to, during, and after snow events.  Mr. Miller made a judgment call based on his knowledge as the operator of the dome.

128.     Even if wet and heavy snow accumulated on the dome, ADSC would not leave the heat on for the entire night if the forecast was for sunny weather following a storm because the sun would typically melt the snow, which would then slide off the dome.

129.     In February 2009, there was a period of one or more weeks where snow accumulated behind the cables on the dome.  During that time period, ADSC did not keep the thermostat set to the highest temperature and the heat on constantly, including overnight, until the snow melted off.

130.     Although snow had accumulated on the dome for one or more weeks during that time period, Mr. Miller turned the heat off at night.  Mr. Miller had turned off the heat despite being told by Mr. Vandenberg that the heat must be turned to 75°F before, during, and after snow events and kept on continuously until the snow melts off.

131.     Mr. Miller believed that snow and ice would build up along the two lower exterior longitudinal cables that structurally supported the dome.  He first noticed snow building up along the longitudinal cables in February of 2006.

132.     Mr. Miller never made a warranty claim to Farley related to the longitudinal cables.  (*Compare* Dkt. No. 58, Attach. 11, at 663:21-23, 664:17-19 [cited in ¶ 132 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, at ¶ 132 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

133.     Other than the month before the date of the collapse, the dome had always shed snow within a day or two of a snowstorm if the outside temperature was in the mid 20°F range and the sun was out regardless of whether internal heat was applied.  The snow being held up along the longitudinal cables was a short-term occurrence if the outside temperature was in the mid 20°F range and the sun was out, regardless of whether internal heat was applied.

134.    Mr. Miller would use air pressure to aid the dome in shedding snow. The use of air pressure would help the dome keep its curvature.  Typically, if there was a six inch snow storm of dry snow, the air pressure would be set at around 1.1 or 1.2 inches per water column.  If there was a six inch snow storm of wet heavy snow, then ADSC may have the air pressure at 1.5 inches per water column.  On the date of the collapse, the dome was operating at approximately 2.1 inches per water column.

135.    In general, ADSC would set the thermostat during week days in winter months at 59°F or 60°F degrees.  The heat would turn on at 3:00 pm.  The heat would automatically shut off at 10:00 pm on weekdays when the dome was in use.  The operation of the heating system was on a program with an automatic timer.  Sometimes the hours of heating would be manually adjusted depending on what activities were occurring in the dome.  On a normal winter week day night, the heat would be turned off after activities had ceased in the dome and turned back on around 3:00 pm the next afternoon.  On weekends the heat could be turned on as early as 5:00 am and shut down as late as 11:00 pm.

### 9.    Air Pressure Fluctuation of the Dome to Remove Snow

136.    Since at least 2006 or 2007, ADSC had been using air pressure fluctuation as a method of fracturing snow on the dome on certain occasions.

137.    While performing a pressure fluctuation, Mr. Miller would lower the pressure 1/10 of an inch to 3/10 of an inch at a time and then raise it back up.  He would do a series of three to five fluctuations in a set.

138.    Mr. Miller did not call Farley for advice or supervision when employing the pressure fluctuation method the first time because Farley had previously suggested the method.

139.     Farley representatives were never present when Mr. Miller performed a pressure fluctuation to fracture snow or ice.

140.     Because Farley had instructed Mr. Miller on how to use the pressure fluctuation method, Mr. Miller did not contact Farley before or during ADSC's performance of the pressure fluctuation method to fracture snow and ice. (*Compare* Dkt. No. 58, Attach. 12, at 59:14-20 [cited in ¶ 140 of Def.'s Rule 7.1 Statement, which establishes that Mr. Miller did not contact Farley when using the pressure fluctuation method] *with* Dkt. No. 69, Attach. 7, at ¶ 140 [Pls.' Rule 7.1 Response, citing record evidence that Mr. Miller did not contact Farley before using pressure fluctuation method because Farley had previously advised him regarding its use].)

141.     ADSC used the pressure fluctuation method of fracturing snow and ice on at least twelve (12) occasions in the years before the collapse.  On approximately six (6) of those occasions he had air pressure at or close to its maximum of 2.1 inches per water column before beginning the process.

142.     The pressure fluctuation method was a fairly effective method for fracturing snow and ADSC never experienced any negative consequences before the date of the collapse.

143.     Mr. Miller would generally do a pressure fluctuation during the day when the dome was empty and the sun was providing heat to aid in the melting of snow.

144.     Mr. Miller spoke with the owner and operator of the Central Connecticut State University dome regarding procedures he used to handle snow accumulations.  The operator of the Central Connecticut State University dome indicated that he used the pressure fluctuation method to fracture snow and ice on occasion.

145.     Mr. Miller was aware that the Connecticut Sportsplex operator used the pressure fluctuation method to fracture snow and ice on occasion.

146.     Mr. Miller had spoken with the operator of the Calgary dome, who also indicated that he used the pressure fluctuation method a/k/a "burping" the dome on occasion.

147.     Mr. Miller attended an annual U.S. Indoor Conference and had discussed the pressure fluctuation method with other dome operators, including dome operators that owned domes erected by manufacturers other than Farley.

148.     Mr. Miller spoke with enough people about the pressure fluctuation method of fracturing snow and ice that he believed that the pressure fluctuation method was acceptable.

149.     Mr. Miller also read articles from the Canadian Research Institute that advised using the pressure fluctuation method as a method for fracturing snow and ice on domes.

### 10.     Temperatures Inside the ADSC Dome

150.     There are various methods of manual removal of snow and ice from domes used in the industry including the following: Climbing the dome to shovel snow, a controlled deflation of the dome to shovel snow, using a rope across the dome, and fluctuating pressure by opening and closing emergency exit doors.

151.     Sam Hayhoe made service trips to the ADSC dome during the winter months. During one of his visits, Mr. Hayhoe observed that the interior of the dome was kept at an abnormally cold temperature.

152.     After Mr. Miller complained about snow accumulation on the dome, Mr. Hayhoe advised Mr. Miller to turn the heat to the maximum setting and leave it on until the snow shed from the dome.  He also suggested dragging a rope over the top of the dome to fracture the snow.

153.     Mr. Spencer performed warranty work at the dome after it was initially installed. He observed that the dome was kept at an extremely cold temperature.

154.     Mr. Spencer believes that there was snow on the ground at that time.

155.     Mr. Spencer performed work at the dome on another occasion to remove an ice build-up at the dome around the cables.

156.     Mr. Spencer observed at that time that the dome was maintained at a very cold temperature despite ice and snow build-up on the dome.  Assuming that the heat was turned off at night, Mr. Spencer advised Mr. Miller that in order for snow and ice to shed from the dome, ADSC needed to keep the heat on, even overnight.

157.     Mr. Aljoe had received complaints from Farley employees working at ADSC's dome that the dome was cold inside when they worked.  (*Compare* Dkt. No. 58, Attach. 17, at 35:18-36:10 [cited in ¶ 157 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, at ¶ 157 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

158.     As a general method for removing snow, Farley recommends leaving the heat on at the highest level and setting the internal pressure higher for snow removal when snow accumulates on the dome.  If this method is unsuccessful, Farley recommends the customer should contact Farley to send a service technician to the site to remove snow.

### 11.     Events Preceding the Dome's Partial Collapse

159.     In the four (4) to five (5) week period before the date of the collapse, there were a series of approximately six (6) to eight (8) snow storms of varying amounts of snowfall. There was a cycle of freezing and thawing that occurred.

160. During the month before the collapse, when snow had accumulated on the dome, Mr. Miller did not always keep the heat on. When Mr. Miller did have the heat on, he did not always set it to the highest temperature.

161. During the course of the four (4) to five (5) week period before the collapse, ADSC utilized the pressure fluctuation method to fracture snow and ice between three (3) and six (6) times.

162. In the week before the collapse, there was more snow on the dome then there had ever been before.

163. Before contacting Farley, Mr. Miller used the pressure fluctuation method to try to fracture snow and ice build-up on his dome. When that method proved only marginally effective, he contacted Farley for advice and suggestions. (*Compare* Dkt. No. 58, Attach. 8, at 296:23-297:9 [cited in ¶ 163 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, at ¶ 163 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

164. Mr. Miller first contacted Farley on or about February 1, 2011. He was not concerned about the stability of the dome at that time, but was concerned that a forecasted snowstorm on February 4, 2011, or February 5, 2011, could produce more snow loads on the dome than the air pressure could handle. Ultimately, Farley recommended that Mr. Miller perform a controlled deflation of the dome to manually remove snow and ice. (*Compare* Dkt. No. 58, Attach. 12, at 92:3-22, 81:16-82:10 [cited in ¶ 164 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, at ¶ 164 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

165.     During the week preceding the collapse, Mr. Miller did not always maintain heat in the dome to aid the dome in shedding snow.  When the heat was on, he did not always have it set to the maximum temperature.

166.     In November 2010, Mr. Miller was sent an e-mail message from Farley in response to an information request by his insurance carrier pertaining to policy renewal.  The e-mail message stated that the dome was designed in conformance with the Air Structure Designs and Standards Manual, Section A-5.1, which included manual removal of snow when snow remains on the dome more than three days and is more than six inches deep.  Mr. Miller testified that he believed this was the first time he had received information regarding the ASI or manual removal of build up snow.  (*Compare* Dkt. No. 57, ¶ 166 [Def.'s Rule 7.1 Statement, citing record evidence that establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, at ¶ 166 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

167.     In the week preceding the collapse, Mr. Miller did not make arrangements for someone to climb the dome to manually remove snow or for a controlled deflation to manually remove snow.  (*Compare* Dkt. No. 57, ¶ 167 [Def.'s Rule 7.1 Statement, citing record evidence that establishes above-stated fact] *with* Dkt. No. 67, ¶ 167 [Pl.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

168.     On or about Friday, February 4, 2011, after speaking with Mr. Miller, Farley recommended that a technician be sent to aid Mr. Miller in his efforts to shed and/or manually remove snow from the dome.

169.     As a result of the snow and rain mix, the dome began to sag or "dish."  It became progressively worse as the day continued. The dome began to dish along the whole length of the dome.  The ADSC dome had never experienced dishing along the whole length of the dome at any prior time.

170.     On February 5, 2011, the water began to move toward the middle of the dome and cause the dome to flatten out.

171.     Mr. Miller contacted Farley by e-mail message in the late evening of February 4, 2011.  He indicated that the dome was sagging 10 to 12 feet the entire length of the dome and that air pressure was set to its maximum.  Farley sent a return email at 3:15 am on February 5, 2011, approximately forty (40) hours preceding the partial collapse, suggesting that Mr. Miller close the facility.

172.     Despite his concerns and the recommendation by Farley to close the facility, Mr. Miller held a youth sports tournament in the dome the mornings and afternoons of February 5, 2011, and February 6, 2011 (the date of the collapse).  However, lacrosse practice was cancelled the night of the collapse either by him or the lacrosse team due to the Super Bowl.

173.     The night of February 5, 2011, there was a lot of water causing dishing on the top of the dome.  ADSC increased the air pressure, using a method taught to Mr. Miller by Farley, which aided in causing slush, snow and ice to shed from the dome.  According to Mr. Miller, the dome rounded out.  (*Compare* Dkt. No. 58, Attach. 7, at 151:6-152:8 [cited in ¶ 173 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, at ¶ 173 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

174. Mr. Hayhoe became aware that there was large snow accumulation on the ADSC dome. Mr. Hayhoe was in Connecticut shoveling snow off of the roof of the Connecticut Sportsplex when he was told by Mr. Simpell that the ADSC had a large snow accumulation on the dome. Mr. Hayhoe was notified that he could be required to go to the ADSC dome after Connecticut if Mr. Miller requested.

175. While he was traveling back to Guelph, Ontario, from Connecticut, Mr. Hayhoe was again told that he may have to turn around and go to Queensbury if Mr. Miller requests assistance. After he returned home, the evening of February 5, 2011, he was told by Jason Aljoe to go down to Queensbury to look at the situation.

176. Mr. Miller did not request that Farley send a technician until February 4, 2011. (*See* Dkt. No. 58, Attach. 9, at 324:16-326:12 [cited in ¶ 176 of Def.'s Rule 7.1 Statement, which establishes above-stated fact].)

177. Before February 5, 2011, Mr. Miller never contacted Farley requesting that it send representatives to perform snow removal at the ADSC dome. In addition, ADSC did not retain an outside contractor to perform snow removal or a controlled deflation of the dome.

178. Mr. Miller learned that Mr. Hayhoe would arrive at the dome on Sunday, February 6, 2011.

179. It did not snow on the day before the collapse or the day of the collapse. However, in the afternoon of the day of the collapse, dishing reoccurred. The youth tournament was in session while this was occurring. However, Mr. Miller did not end the tournament early.

180.     Mr. Hayhoe left the following morning, on February 6, 2011, to go to Queensbury, New York.  It is a seven-hour trip from Guelph, Ontario, to Albany, New York, without taking rest stops or delays in border crossing into account.  Mr. Hayhoe arrived in Albany at 6:00 pm.  Because it was dark, he decided to stay in a hotel in Albany.  He would not be able to determine the amount of snow and ice on the dome and does not climb domes in the dark for safety reasons.

181.     Mr. Hayhoe advised Mr. Miller that he would not be able to make it to the dome that night and they began making arrangements for his arrival the next morning.  Subsequently, Mr. Hayhoe spoke with Mr. Aljoe and advised him that he would not make it to the dome because it was dark and not safe to climb the dome.  (*Compare* Dkt. No. 58, Attach. 15, at 74:4-75:4, 135:18-136:16; Dkt. No. 58, Attach. 17, at 77:8-15 [cited in ¶ 173 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 67, ¶ 173 [Pl.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

182.     The partial collapse occurred between 8:00 pm and 9:00 pm on Sunday, February 6, 2011.

183.     Mr. Miller did not use the pressure fluctuation method on February 5, 2011, due to the amount of dishing.  However, on February 6, 2011, he believed that the slush on the dome was softer and could be fractured more easily.  In addition, the forecast for the evening of February 6, 2011, was for freezing temperatures.  So Mr. Miller decided that performing a pressure fluctuation was the best option.

184.     Mr. Miller dropped the air pressure in the dome from 2.1 inches per water column to 2.0 inches per water column.  The dome stabilized after twenty minutes.  He then set it down from 2.0 inches per water column to 1.9 inches per water column.  Shortly thereafter, a partial collapse of the dome occurred at the southeast quadrant due to the shifting of ice and snow.

12. **Events Post-Collapse of the ADSC Dome**

185.     The next time Mr. Hayhoe spoke with Mr. Miller, he was informed about the partial collapse.  Mr. Hayhoe recommended that Mr. Miller perform a controlled deflation of the dome after the partial collapse.  (*Compare* Dkt. No. 58, Attach. 15, at 75:11-19 [Def.'s Rule 7.1 Statement, citing record evidence that establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 185 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

186.     After the partial collapse, Mr. Aljoe recommended that Mr. Miller lower the dome to the ground.  Mr. Miller did not deflate the dome after the partial collapse despite Mr. Aljoe's recommendation.  (*Compare* Dkt. No. 58, Attach. 17, at 80:4-81:11 [cited in ¶ 186 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 186 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

187.     Mr. Hayhoe did not arrive until February 7, 2011, the day after the collapse.  Mr. Miller was not particularly upset with Mr. Hayhoe's failure to arrive because Mr. Miller did not believe anything else could have been done to change the course of events.  In other words, after all the communications that occurred in the week preceding the collapse, there was nothing that Sam Hayhoe could have done to change the course of events.

188.     Mr. Miller did not have any criticism of how Farley handled the collapse, per se. In hindsight, Mr. Miller may have preferred that Farley responded better during the time leading up to the collapse of the dome.  However, Mr. Miller did not believe that there would have been a different outcome if Farley was on-site the week preceding the collapse.  His only criticism was that he believed the two outermost cables held back snow and ice.

189. When Sam Hayhoe arrived at the dome on February 7, 2011, Mr. Hayhoe recommended completely deflating the dome. However, Mr. Miller raised concerns about this course of action because he believed doing so would damage the batting cages, which, in turn, could potentially damage the dome's fabric. So, they began to remove the snow from the collapsed portion of the dome without the dome being deflated.

190. Ultimately, the dome was later deflated the following week. Mr. Miller was concerned about damage to the batting cages and punctures to the dome by the batting cages.

191. There was approximately 770 cubic yards of snow and ice on the dome. The weight of ice and snow on the dome was approximately 350 tons.

192. A measurement was taken after the partial collapse of the dome. There was an area of snow on the dome with an approximate depth of four (4) feet measuring 130 feet long by 51 feet wide.

193. Mr. Hayhoe observed an abnormally large amount of snow on the dome the next morning when he arrived in Queensbury. He had seen more snow on a dome that was deflated, but never more snow on a dome that was partially up.

194. After the collapse, Theresa Miller, a principal of ADSC, advised Mr. Hayhoe that heating costs were too high to constantly keep the heat on in the dome as a snow removal method. (*Compare* Dkt. No. 58, Attach. 15, at 92:2-17 [cited in ¶ 194 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 194 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

### 13.     Damage Caused by the Dome's Collapse

195.     ADSC hired Farley to aid in removing snow from the partially collapsed dome. In addition, Farley was retained by ADSC to perform temporary repairs to the fabric panels due to punctures caused by the collapse.  ADSC also entered into discussions with Farley regarding the replacement of fabric sections of the dome and repair/replacement of lights and ballasts.

197.     Ultimately, Farley was retained to replace three panels of fabric on the dome as well as lights and ballasts that were damaged due to the collapse.

198.     A portion of the dome was reopened to the public approximately one week after the collapse.  The whole dome was reopened to the public in March of 2011.

199.     ADSC retained a public adjuster, Andrew Fusco of WorldClaim, to aid in its dealings with the insurance companies and in adjusting the loss.

200.     ADSC filed insurance claims with Lloyd's London and Peerless Ins. Co./Inland Marine, its insurance carriers, for damage to the dome, which included the turf field, as well as for damage to business personal property and business interruption loss.

201.     As a result of the collapse, lights were damaged causing glass to become embedded in the turf field.  The turf field was replaced because Lloyd's London would not continue to insure the dome unless it was replaced.

202.     Portions of the dome's old turf are now being used by another dome operator.

203.     Lloyd's provided only coverage for the dome and the turf, including the ballasts and lights inside the dome.  Farley's invoices for snow removal and temporary repairs to the dome, as well as the fabric panel replacement and repair/replacement of lights and ballasts, were paid through insurance payments from Lloyd's London.  Similarly, the turf replacement was paid through insurance payments from Lloyd's London.

204.     Peerless Ins. Co./Inland Marine insured the business personal property and business interruption loss.  In addition to the damage to the dome, there was some damage to a golf cart, fencing used for baseball and softball, batting cages, garbage barrels and soccer goals. Equipment damages were fully reimbursed through an insurance policy issued by Peerless Ins. Co./Inland Marine.

205.     Peerless also paid at least $40,403.00 toward ADSC's business interruption claim. The business interruption claim is still being pursued by ADSC as against Peerless.  In fact, ADSC's pursuit of its insurance claim for business interruption against Peerless is a condition to a Forbearance Agreement it entered into with one of its mortgage holders.

206.     ADSC's claim in the Member Case against Farley is solely for economic damages in the form of unreimbursed business interruption losses, refunds to customers, and interest and default fees on business loans. (*Compare* Dkt. No. 58, Attach. 10, at 560:24-561:15 [cited in ¶ 206 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 206 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

207.     ADSC had a $25,000 deductible on the Lloyd's policy.  ADSC did not have a deductible applied on the Peerless/Inland Marine policy.

208.     In a conference call between Mr. Miller, Farley's President and CEO, John Simpell, and ADSC's public adjuster, Andrew Fusco, Farley was instructed to increase Farley's invoices for repairs and replacements to the dome by 20% (10% for overhead and 10% for profit).  As a result, Farley re-submitted marked-up invoices to ADSC.  Ultimately, ADSC advised Farley that all its invoices must be marked-up.

36

209.     In addition, Mr. Miller had similar conversations with the turf provider.  The turf provider also marked-up its invoices by 20% (10% for overhead and 10% for profit) as requested by ADSC and its agent, Andrew Fusco.

210.     ADSC kept in excess of $118,000.00 from monies paid by Lloyd's London on the invoices submitted by Farley for repairs and replacements to the dome.  These monies were meant to cover ADSC's deductible and public adjuster fees and were issued as a credit note against the contract price for the repair and replacement of the dome as a consulting fee.

211.     Since the collapse, ADSC has continued using the pressure fluctuation method to fracture snow and ice that has accumulated on the dome.  In March 2013, ADSC experienced a snow event.  Farley sent correspondence recommending that ADSC perform a controlled deflation.  Instead, Mr. Miller utilized the pressure fluctuation method to fracture snow and ice.  Once all of the snow had shed off the dome at that time, Mr. Miller may have turned the heat down inside the dome.  He also did not keep the thermostat set at the highest temperature.

212.     The air-supported structure manufactured by Farley is a temporary structure that can be moved.  ADSC considers the air-supported structure temporary for accounting and tax purposes. (*Compare* Dkt. No. 58, Attach. 7, at 59:9-60:5 [cited in ¶ 212 of Def.'s Rule 7.1 Statement, which establishes above-stated fact] *with* Dkt. No. 69, Attach. 7, ¶ 212 [Pls.' Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

213.     In March 2013, Mr. Miller contemplated moving the dome to a location out of state or on Long Island and requested that Farley provide an estimate for the cost of bringing down the dome, transporting it and re-erecting it at another location.  Mr. Miller also obtained estimates from his concrete contractor for installation of a grade beam, ducts and concrete at a new location.

214. A large portion of Farley domes are used seasonally and taken down during the warmer months.

215. Other than those asserted in the current consolidated action, there have only been two other legal claims filed against Farley for collapses of their domes. One claim was related to the failure of a cable anchor plate, which connects the dome to the grade beam, resulting in a dome's fabric being ripped. The other claim involved a failure in a dome in Iowa as a result of wind.

**E.      Parties' Briefing on Defendant's Motion for Summary Judgment**

**1.      Defendant's Memorandum of Law-in-Chief**

Generally, in its memorandum of law, Defendant argues that it is entitled to judgment as a matter of law for five reasons. (Dkt. No. 38, Part 6 [Def.'s Mem. of Law].) First, Defendant argues that Plaintiffs' causes of action based in negligence and strict products liability for alleged defects in the design of the dome fail as a matter of law for the following reasons: (a) the dome was designed in accordance with the 2002 New York State Building Code, ASI-77, and federal regulations; (b) application of the risk-utility test establishes that the dome's utility outweighed any potential risk of harm; (c) the economic loss rule precludes Plaintiffs from recovering in tort for alleged defects in the design of the dome; and (d) Plaintiffs cannot establish that the partial collapse was proximately caused by a defect in the design of the dome. (Dkt. No. 58, ¶¶ 20-94 [Bundschuh Decl.]; Dkt. No. 59, at 1-11 [Def.'s Mem. of Law].)

Moreover, Defendant argues that Plaintiffs' negligence and strict products liability causes of action are barred by New York's three-year statute of limitations for property damage. (Dkt. No. 58, ¶¶ 95-99 [Bundschuh Decl.]; Dkt. No. 59, at 11-12 [Def.'s Mem. of Law].) Specifically,

Defendant contends that the applicable statute of limitations accrued in 2007, when Mr. Miller first observed damage to the dome due to snow loads that caused cable pockets on the dome to rip.  (Dkt. No. 58, ¶¶ 97-98 [Bundschuh Decl.].)  Therefore, because the Lead and Member Cases were not commenced until 2013 and 2012, respectively, Defendant argues that the actions are now barred.  (*Id*. ¶¶ 98-99.)

Second, Defendant argues that Plaintiffs cannot establish that defective warnings or instructions were the proximate cause of the dome's partial collapse, because ADSC's misuse of the dome was the sole proximate cause of the collapse, and Mr. Miller was aware of the dangers associated with allowing snow to accumulate on top of the dome.  (Dkt. No. 58, ¶¶ 100-117 [Bundschuh Decl.]; Dkt. No. 59, at 6-10 [Def.'s Mem. of Law].)  In any event, Defendant argues the economic loss rule precludes any recovery on this basis.  (*Id.*)

Third, Defendant argues that Plaintiffs' causes of action based upon breach of contract and breach of express and implied warranties should be dismissed for the following reasons: (a) because the causes of action accrued no later than December 9, 2005, when the dome, or "good," was tendered to ADSC, the claims are barred by the four-year statute of limitations set forth in U.C.C. § 2-725; and (b) Plaintiffs are precluded from recovery due to ADSC's continued use of the dome after discovery of the alleged defect and gross misuse of the dome by allowing substantial snow loads to accumulate despite warnings and instructions by Farley.  (Dkt. No. 58, ¶¶ 118-42 [Bundschuh Decl.]; Dkt. No. 59, at 13-19 [Def.'s Mem. of Law].)

Fourth, Defendant argues that Plaintiffs are precluded from recovering damages for consequential economic damages.  (Dkt. No. 58, ¶¶ 143-54 [Bundschuh Decl.]; Dkt. No. 59, at 19-21 [Def.'s Mem. of Law].)  According to Defendant, the contract between Farley and ADSC

provided a warranty containing a limitation-of-liability provision that precludes Plaintiffs from recovering such damages both in contract and tort. (Dkt. No. 58, ¶ 143 [Bundschuh Decl.].)

Fifth, and finally, Defendant argues that Plaintiffs' cause of action for negligent advice and/or misrepresentation must be dismissed for the following reasons: (a) Mr. Miller's deposition testimony establishes that he did not actually rely on the alleged negligent advice or that any alleged reliance would have been reasonable under the circumstances; and (b) ADSC and Farley did not have a special, or privity-like, relationship sufficient enough to impose a duty on Farley to impart correct information to Plaintiffs. (Dkt. No. 58, ¶¶ 155-76 [Bundschuh Decl.]; Dkt. No. 59, at 22-25 [Def.'s Mem. of Law].)

### 2. Underwriters' Opposition to Defendant's Motion for Summary Judgment

Generally, in opposition to Defendant's motion, Underwriters assert seven arguments. (Dkt. No. 66, at 3-24 [Underwriters' Opp'n Mem. of Law].) First, Underwriters argue that the dome was defectively designed for the following reasons: (a) the dome was not in compliance with local snow load requirements because it was designed for a ground snow load of 45 pounds per square foot ("PSF") and structures within the Town of Queensbury are supposed to be rated at 70 PSF; (b) the dome was not in compliance with ASI-77 because the dome's height-to-width ratio was below the minimum level set by ASI, thereby limiting its ability to shed snow; (c) the Defendant's purported compliance with applicable codes and regulations does not constitute prima facie evidence that the dome was not defectively designed; (d) application of the seven (7) factors contained in the risk-utility test weigh in Underwriters' favor; and (e) in any event, Underwriters have met their burden in establishing a triable issue of fact with respect to the dome's defective design. (*Id.*, at 3-7.)

Second, Underwriters argue that the economic loss rule is inapplicable to the present case and is not otherwise a bar to recovery for the following reasons: (a) the manner in which the injury occurred was "an abrupt, cataclysmic occurrence," which "mitigates strongly in favor of a finding of tort liability"; (b) a dome that is defectively designed is inherently dangerous; and (c) the damages being sought are not only to the "product itself," but also to "other property," such as damage to turf, golf carts, batting cages, and soccer goals that precludes application of the economic loss rule. (*Id.* at 7-10.)

Third, Underwriters argue that the dome's collapse was proximately caused by a defect in the design of the dome, and not by the actions of ADSC, for the following reasons: (a) ADSC complied with Defendant's instructions regarding the operation of the dome at all times and, to the extent that ADSC deviated from these instructions and purportedly caused the collapse, those actions were specifically undertaken at Defendant's direction; (b) ADSC's alleged failure to properly heat the dome is irrelevant to the claims that the dome's design failed to withstand the snow load that it was expressly represented as being able to withstand; (c) in any event, a triable issue of fact exists regarding whether failure to heat the dome proximately caused the collapse because this is based on a fact-specific inquiry; (d) the dome was not designed for manual removal of snow accumulations on top of the dome, nor was it safe to do so without a Farley technician, and cannot, therefore, serve as a basis for summary judgment; and (e) a triable issue of fact exists regarding whether the dome's collapse was caused by a reduction in the dome's pressure and, even if the collapse was due to this reduction, ADSC reduced the pressure on the day of the collapse at the specific direction of Defendant's service technician and the dome was never brought below the minimum pressure set forth in the dome's operating manual. (*Id.* at 11-16.)

Fourth, Underwriters argue that the statute of limitations does not bar recovery for defective design of the dome. (*Id.* at 16-17.) Specifically, Underwriters argues that the statute of limitations did not begin to accrue until the date of the dome's partial collapse, in February 2011, because they were not able to allege all the elements of their causes of action until the injury and damages occurred. (*Id.* at 17.) Furthermore, Underwriters have asserted several claims for design defects beyond those related to the design and installation of the longitudinal cables, which Defendant uses as a basis for its proposed accrual date in 2007. (*Id.*)

Fifth, Underwriters argue that genuine issues of material fact exist regarding their claims for failure to warn and negligent instruction for the following reasons: (a) Defendant failed to warn ADSC of what the dome's actual minimum snow load capability was, which Defendant should have been aware of had it performed proper snow load calculations and had them reviewed by an engineer; (b) had Defendant warned ADSC of the dome's actual snow load capability, the collapse may have been avoided because ADSC likely would have sought Defendant's assistance to manually remove the snow and/or perform a controlled deflation; (c) Defendant failed to provide ADSC with adequate warnings regarding the alleged need to manually remove snow accumulations from the dome's roof; and (d) Defendant failed to provide ADSC with adequate warnings and/or instructions for the safe operation of the dome when Mr. Miller contacted Defendant for guidance and assistance after he had exhausted all methods for combating snow accumulation contained in the operator's manual. (Dkt. No. 66, at 17-20 [Pl.'s Opp'n Mem. of Law].)

Sixth, Underwriters argue that Defendant is not entitled to summary judgment on their claims for breach of implied and express warranty for the following reasons: (a) because the

42

contract executed by ADSC and Defendant was a construction contract for a permanent structure, not a movable good, it is not governed by the four-year statute of limitations under U.C.C. § 2-105; and (b) ADSC did not grossly misuse the dome. (*Id.* at 20-23.)

Seventh, and finally, Underwriters argue that a genuine dispute of material fact exists regarding their claims related to negligent misrepresentation for the following reasons: (a) ADSC and Defendant had a special relationship and their pattern of close contact with each other regarding the operation of the dome may also constitute an implied service contract; (b) Defendant held itself out as having superior knowledge regarding the dome and specifically instructed ADSC to contact Defendant for assistance when needed; and (c) Defendant misrepresented the dome's snow load capabilities and its ability to shed snow during a time when the parties were in actual privity and those representations were reasonably and justifiably relied upon by ADSC and the Town of Queensbury. (*Id.* at 23-25.)

### 3.    ADSC's Opposition to Defendant's Motion for Summary Judgment

Generally, in opposition to Defendant's motion, ADSC assert six arguments. (Dkt. No. 69, Attach. 9, at 5-27 [ADSC's Opp'n Mem. of Law].) First, ADSC argues that the dome was defectively designed for the following reasons: (a) the dome was designed by an unqualified individual (Jason Scmidt) with no engineering education, training or license, who produced false engineering calculations regarding the dome's ability to withstand snow loads; (b) the dome was not in compliance with ASI-77 because the dome's height-to-width ratio (which determines how steep or flat the dome is) was below the minimum level set by ASI, thereby limiting the dome's ability to shed snow; and (c) the longitudinal cables placed on top of the dome were too short, causing the dome's height-to-width ratio to be even smaller and causing snow and ice to accumulate behind the cables. (*Id.* at 5-19.)

43

Second, ADSC argues that the economic loss rule does not preclude recovery of the damages alleged in this action because Defendant held itself out as an expert in the design and construction of air supported structures. (*Id.* at 19-20.) In addition, ADSC argues that Defendant provided grossly inaccurate engineering calculations that were crucial to the stability of the dome and then misled a Town of Queenbury building official when questioned about snow load calculations. (*Id.* at 20.)

Third, ADSC argues that the improper calculations provided by Mr. Schmidt, the defective design of the dome's height-to-width ratio, the neglect by Mr. Hayhoe (a Farley employee) in failing to arrive at the dome before the dome's collapse, and the improper design and placement of the longitudinal cables were the proximate cause of the dome's collapse. (*Id.* at 21-22.)

Fourth, ADSC argues that the four-year statute of limitations under U.C.C. § 2-105 is inapplicable because the dome is a permanent structure with an unmovable foundation, which was designed by Farley. (*Id.* at 22.) Furthermore, ADSC argues that the subject contract was not a sales contract but rather one for services and/or construction because the main objective of the contract was for Farley to design, construct, and service an air-supported structure to be used as a sports dome. (*Id.* at 23.)

Fifth, ADSC argues that the exculpatory clause contained in a warranty attached to the subject contract does not bar consequential damages as a matter of law. (*Id.* at 24-26.) Specifically, ADSC argues that enforceability of the clause depends on the circumstances surrounding the transaction, and that a genuine dispute of material fact exists regarding the alleged gross negligence of Mr. Schmidt, Farley's lead designer, when he intentionally made

false representations to the local building department regarding the dome's ability to withstand local snow loads. (*Id.* at 24-25.) In addition, ADSC argues that the clause is unenforceable because its provisions were obtained through overreaching. (*Id.* at 25-26.) This is because Farley allegedly took advantage of Mr. Miller's reliance on Farley's expertise and, although Farley knew that it was not capable of designing and constructing an air supported structure suitable for this specific geographic location (Queensbury, NY), Farley entered into the contract anyway. (*Id.*)

Sixth, and finally, ADSC argues that Defendant is not entitled to summary judgment on ADSC's claim for negligent misrepresentation for the following reasons: (a) as the designer and constructor of the dome, Farley had a special relationship with ADSC requiring it to provide correct information; (b) Farley made false representations regarding its snow load calculations that it knew, or should have known, were incorrect and knew that ADSC would rely upon such information for a serious purpose; (c) Farley held itself out as a purported expert in the field of dome design and construction to both ADSC and the Town of Queensbury Building & Codes office and, based upon this representation, ADSC relied on the information regarding snow load capabilities to its detriment. (*Id.* at 26-27.)

### 4. Defendant's Reply to Plaintiffs' Respective Oppositions to the Motion for Summary Judgment

Generally, in reply to Plaintiffs' respective opposition papers, Defendant makes the following arguments. (Dkt. No. 73, Attach. 4 [Def.'s Reply Mem. of Law].) First, Defendant argues that the Court should disregard the opinions of Plaintiffs' expert, Thomas Grafe, PE, because Mr. Grafe's expert affidavit, submitted in support of Plaintiffs' opposition papers, violates this Court's Pre-Trial Scheduling Order. (*Id.* at 1-4.) Specifically, Defendant argues that

Plaintiffs failed to serve, before the close of discovery, an expert report from Mr. Grafe regarding the following opinion testimony: (a) the alleged defects with the height-to-width ratio of the dome, stratification of warm air, the length of longitudinal cables, and issues regarding the repairs made to longitudinal cables sleeves; (b) the alleged defects in instructions provided by Farley to ADSC, including the use of manual removal of snow; (c) whether Farley was required to retain an engineer to design the dome and the alleged negligent advice given by Farley to ADSC; (d) Farley's alleged negligence in responding to ADSC's request for assistance immediately before the partial collapse; and (e) the purported feasible design alternatives with respect to the design of the dome. (*Id.* at 2-3.) In addition, Defendant argues that Mr. Grafe's opinions lack probative value because they are based on hearsay, conjecture, and conclusions unsupported by admissible evidence. (*Id.* at 3-4.) Moreover, Defendant argues it will suffer immense prejudice if Mr. Grafe's affidavit is considered because it contains theories of liability that were not previously asserted. (*Id.*)

Second, Defendant argues that, should the Court consider Mr. Grafe's affidavit, the Court should, nonetheless, disregard Mr. Grafe's findings and conclusions because they are too speculative and conclusory to be of any probative value for the following reasons: (a) Mr. Grafe's contention that Defendant provided no indication that manual snow removal may be required is not supported by the admissible evidence; (b) Mr. Grafe's contention that the dome may not have had sufficient heat output to melt snow is speculative because he does not refer to any testimony, did not conduct his own testing and/or observation, and does not indicate that the heating system should have been designed differently; (c) Mr. Grafe's contention that Defendant should have employed an engineer to prepare the drawings and calculations has no probative value because

this information was sent to an outside licensed professional engineer for review and certification; (d) Mr. Grafe's contentions that the snow load calculations were improper and that Mr. Schmidt was misleading in his e-mail to Mr. Hatin and Mr. Miller with respect to those calculations are conclusory because Mr. Schmidt advised the Building & Codes office that the dome was designed pursuant to ASI-77 and the Codes Office issued a building permit without further inquiry; (e) Mr. Grafe fails to cite any support for his contention that ASI-77 requires air supported structures to have a height-to-width ratio between .30 and .50; (f) Mr. Grafe's contention that Mr. Hayhoe could have reached ADSC before nightfall on the night of the partial collapse is improper; (g) Mr. Grafe's contention that Defendant took responsibility to protect the dome from snow accumulation is conclusory and not supported by admissible evidence because Mr. Miller testified that he was solely responsible for the operation and maintenance for the dome and ADSC did not enter into any service or maintenance agreements with Defendant; (h) Mr. Grafe does not offer any evidence in support of his contention that the longitudinal cables were improperly designed or placed; and (i) Mr. Grafe fails to offer any support for his opinion regarding feasible alternative designs, such as whether dome manufacturers are using the alleged feasible design alternatives.  (*Id.* at 4-11.)

Third, Defendant argues that the affidavits submitted by Mr. Hatin and Mr. Miller fail to raise a genuine dispute of fact.  (*Id.* at 11.)  With respect to Mr. Hatin's affidavit, Defendant argues there is no dispute that ASI-77 is the relevant standard that governs the structural design of air-supported structures and is incorporated by reference into the 2002 New York State Building Code.  (*Id.*)  Furthermore, Defendant argues that Mr. Hatin's contention that Mr. Schmidt avoided answering his concerns regarding the design of the dome and its ability to

47

support snow loads of 70 PSF lacks probative value.  (*Id.*)  Specifically, Defendant argues that

Mr. Hatin admits he decided to issue a building permit without familiarizing himself with the

applicable codes and standards he is charged with enforcing or requesting certified snow load

calculations.  (*Id.*)  Similarly, Defendant argues that Mr. Miller's affidavit lacks probative value

because it is based upon information found during an internet search of Farley's competitors and

snow load information contained in marketing materials.

Fourth, Defendant argues that the economic loss rule bars Plaintiffs' recovery in tort

because the dome manufactured by Farley is not a permanent structure; rather, it is a fabric

structure that is portable.  (*Id.* at 11-12.)  Furthermore, Defendant argues the dome is not unduly

dangerous but is a good that, if operated properly, is unlikely to produce a catastrophic accident

or enhance the damage to person or property.  (*Id.* at 12.)  Moreover, Defendant argues that the

accident occurred due to snow and ice being allowed to accumulate on top of the dome for

approximately five (5) weeks because of ADSC's neglect and improper operation of the dome.

(*Id.*)  Finally, Defendant argues that damage to business personal property contained within the

dome at the time of the partial collapse was reimbursed by another insurance company.  (*Id.*)

Therefore, Defendant argues that the only damages being sought are for repair and replacement

of the dome itself, repair and replacement of items that were made a part of the dome, and

consequential economic losses (which, according to Defendant, are excluded under the terms of

the contract between ADSC and Defendant).  (*Id.*)

Fifth, Defendant argues that the contract it entered into with ADSC was not a service

and/or construction contract.  (*Id.* at 13.)  Specifically, Defendant argues that, as the contract and

testimony establish, the permanent appurtenances, including concrete and grade beams, were

installed by ADSC. (*Id.*) Defendant claims that it provided only supervision for the erection of the dome and that ADSC provided the labor to effectuate the erection. (*Id.*) Furthermore, Mr. Miller testified that Defendant did not have a service contract with ADSC and that ADSC was responsible for the service and maintenance of the dome. (*Id.*) Finally, Defendant argues that, even if the dome became permanent upon erection, the U.C.C. requires only that a good be movable at the time of contract formation or creation of the good. (*Id.*) Accordingly, Defendant argues that the dome supplied by Farley was movable at the time, and that Plaintiffs' arguments in opposition are insufficient to raise a genuine dispute of material fact. (*Id.*)

Sixth, and finally, Defendant argues that Plaintiffs have failed to raise a genuine dispute of material fact regarding whether Farley's alleged negligent misrepresentation resulted in the dome's partial collapse. (*Id.* at 13-14.) Specifically, Defendant argues that Plaintiffs have failed to establish that, had the dome been designed to support ground snow loads of 45 PSF, the dome would not have collapsed. (*Id.* at 14.) Furthermore, according to Defendant, Plaintiffs cannot establish that ADSC justifiably relied on alleged misrepresentations contained in correspondence from July 2005 (regarding snow load calculations) and that such reliance was the proximate cause of the loss. (*Id.*)

### 5. Underwriters' Sur-Reply[1]

Generally, in response to the propriety of Defendant's submission of thirty (30) "non-testimonial" exhibits as part of its reply, Underwriters make the following arguments. (Dkt. No. 75 [Underwriters' Sur-Reply].) First, Underwriters argue that Defendant has submitted the

---

[1]     On June 9, 2014, the Court gave leave to both Underwriters and ADSC to file two-page letter briefs addressing the narrow issue of whether it is appropriate for the Court to consider thirty (30) "non-testimonial" exhibits submitted as part of Defendant's reply. (Dkt. No. 72 [Text Order filed June 9, 2014].)

affidavit of Mr. Schmidt, which is plainly testimonial in nature. (*Id.* at 1.) Furthermore, Underwriters note that the other exhibits, which are "non-testimonial," are exhibits attached to the Schmidt Reply Affidavit, not the Defendant's Reply brief itself. (*Id.*) Accordingly, Underwriters argue that the Court should disregard the Schmidt Reply Affidavit and the exhibits attached thereto. (*Id.*)

Second, Underwriters argue that there is no legitimate basis for Defendant's submission of new evidence on reply. (*Id.*) Underwriters note that Mr. Schmidt has already submitted an affidavit in connection with the initial moving papers. (*Id.*) Therefore, Underwriters argue that Defendant should have raised the points contained in Mr. Schmidt's second affidavit in its initial moving papers. (*Id.*)

Third, and finally, Underwriters argue that Defendant's contention that it is necessary to submit new evidence in response to additional evidence submitted by Underwriters in their opposing papers, should be rejected because Underwriters did not submit additional evidence. (*Id.* at 1-2.) Specifically, Underwriters note that Defendant chose not to depose Mr. Grafe. (*Id.* at 2.) Moreover, with respect to Mr. Grafe's opinions, Underwriters note that Mr. Grafe's initial expert report provided adequate notice of his opinions to Defendant and that these opinions were simply elaborated upon in his expert affidavit. (*Id.*)

## 6.    ADSC's Sur-Reply

Generally, in response to the propriety of Defendant's submission of thirty (30) "non-testimonial" exhibits as part of its reply, ADSC makes the following arguments. (Dkt. No. 76 [ADSC's Sur-Reply].) First, similar to Underwriters' argument, ADSC notes that Defendant has attached the affidavit of Mr. Schmidt, as well as marketing materials from Farley's competitors,

which, according to ADSC, is in violation of the Court's Order. (*Id.* at 1.) Furthermore, ADSC argues that, should the Court overlook this violation, the exhibits should be excluded nonetheless because they constitute new evidence, which has been improperly introduced in a reply brief. (*Id.*) Second, and finally, ADSC argues that, should Mr. Schmidt's affidavit be considered, summary judgment must still be denied because numerous genuine disputes of material fact exist. (*Id.* at 2-3.)

### 7.    Defendant's Sur-Sur-Reply to Plaintiffs' Sur-Replies

Generally, in response to ADSC's and Underwriters' respective sur-replies, Defendant makes the following arguments. (Dkt. No. 77 [Def.'s Sur-Reply].)  First, Defendant argues that the sur-replies have gone beyond the scope of the Court's Order because they challenge the admissibility and substance of Defendant's reply papers. (*Id.* at 1-2.)

Second, and finally, Defendant argues that it has complied with the Court's Order because, in its letter application to the Court (Dkt. No. 70 [Def.'s Letter Mot. requesting enlargement of reply papers]), Defendant expressly requested leave to file reply papers, including reply affidavits, totaling no more than twenty (20) pages in length. (*Id.* at 2.)  Defendant advised that Plaintiffs consented to this request with the caveat that Plaintiffs objected to the inclusion of the thirty (30) pages of non-testimonial exhibits. (*Id.*)  Accordingly, Defendant argues that it is in compliance with the twenty-page limit because Mr. Schmidt's affidavit is six (6) pages in length and the reply memorandum of law is less than fourteen (14) pages in length. (*Id.*) Defendant concedes that Mr. Schmidt's affidavit is testimonial; however, Defendant argues that the affidavit is a part of the reply papers themselves and should not be considered as part of the non-testimonial exhibits that accompanied Defendant's reply papers to which Plaintiffs specifically objected. (*Id.*)

## II.   APPLICABLE LEGAL STANDARDS

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *see also* Fed. R. Civ. P. 56(e)(2).  As the Supreme Court has famously explained, "[the non-moving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movign party. *Anderson*, 477 U.S. at 255.  In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(c), (e).  However, when the moving party has met this initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with specific facts showing a genuine dispute of

material fact for trial. Fed. R. Civ. P. 56(c), (e). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143, n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## III.    ANALYSIS

### A.    Whether the Economic Loss Rule Bars Plaintiffs' Tort Claims

After carefully considering the matter, the Court answers this question in the negative with respect to Plaintiffs' negligent misrepresentation claims and Underwriters' claim regarding replacement of the turf field as "other property." However, the Court answers this question in the affirmative with respect to Plaintiffs' remaining claims regarding the dome itself for the reasons stated in Defendant's declaration in support of its motion and Defendant's memoranda of law. (Dkt. No. 58, ¶¶ 68-76 [Bundschuh Decl.]; Dkt. No. 59, at 7-10 [Def.'s Mem. of Law]; Dkt. No. 73, Attach. 4 at 11-12 [Def.'s Reply Mem. of Law.].) To those reasons, the Court adds the following analysis:

> Generally, under the economic loss doctrine, while a product owner may have tort remedies against a product manufacturer for personal injuries caused by a defect in the product, an owner of a product who suffers purely monetary harm to the product itself, due to a defect in the manufacturing or installation of the product, is limited to only whatever remedy the owner may have in contract.

*Wade v. Tiffin Motorhomes, Inc.*, 686 F. Supp. 2d 174, 187 (N.D.N.Y. 2009) (Suddaby, J.). "The rule is applicable to economic losses to the product itself as well as consequential damages

resulting from the defect." *126 Newton St., LLC v. Allbrand Commercial Windows & Doors, Inc.*, 121 A.D.3d 651, 560 (N.Y. App. Div. 2d Dept. 2014). The purpose of this rule is

> to keep contract law from drown[ing] in a sea of tort . . . [and with this goal in mind] New York courts restrict plaintiffs who have suffered economic loss, but not personal or property injury, to an action for the benefits of their bargains. Thus, [i]f the damages suffered are of a type remediable in contract, a plaintiff may not recover in tort.

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 505 (S.D.N.Y. 2013) (quoting *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244, F.R.D. 204, 220 [S.D.N.Y. 2007]). Generally, a court determining whether the economic loss doctrine applies "'should consider the nature of the defect, the manner in which the injury occurred, and the damages sought.'" *Bristol Village, Inc. v. Louisiana-Pac. Corp.*, 916 F. Supp. 2d 357, 365 (W.D.N.Y. 2013) (quoting *Hodgson, Russ, Andrews, Woods & Goodyear, LLP v. Isolatek Int'l Corp.*, 300 A.D.2d 1051, 1052 [N.Y. App. Div. 4th Dept. 2002]).

In the present case, ADSC seeks damages due to the interruption in its business (13-CV-0385, Dkt. No. 1, ¶¶ 30-31) while Underwriters seeks reimbursement for the costs they paid to ADSC to repair the dome as well as replacing the turf field and the dome's roof panels (Dkt. No. 1, ¶ 33). As discussed above in Parts I.E.2. and I.E.3. of this Decision and Order, Plaintiffs argue that the economic loss doctrine does not apply for three reasons: (1) their losses occurred from "an abrupt cataclysmic occurrence" involving a product that could produce catastrophic consequences in the event of an accident; (2) they seek to recover losses to "other property"; and (3) Defendant owed a professional duty of care to ADSC that was independent from its contractual duties. (Dkt. No. 66, at 7-10; Dkt. No. 69, Attach. 9, at 19-20.)

### 1.     "Abrupt Cataclysmic Occurrence"

With respect to the first argument, this Court held in *Wade* that an abrupt cataclysmic occurrence, in and of itself, is insufficient to operate as an exception to the economic loss rule. *Wade*, 686 F. Supp. 2d at 187-88; *see also Hartford Fire Ins. Co. v. Atl. Handling Sys., LLC*, 09-CV-4127, 2011 WL 4463338, at *9 (E.D.N.Y. Sept. 26, 2011) (noting that "Plaintiffs, however, improperly treat as dispositive the sudden manner of the loss"); *Ofsowitz v. Georgie Boy Mfg., Inc.*, 231 A.D.2d 858, 859 (N.Y. App. Div. 4th Dept. 1996) (applying economic loss rule to bar plaintiff's tort claims after motor home was destroyed by "abrupt, accident-like event").  Instead, this Court adopted the analysis from the United States Supreme Court in *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986), despite "language in some New York State Appellate Division cases indicating that the abruptness of an event may be a relevant factor in determining whether the economic loss doctrine applies."  *Wade*, 686 F. Supp. 2d at 188.[2] Applying that analysis here, this Court, as in *Wade*, is unpersuaded by Plaintiffs' argument that the economic loss rule should not apply due to the abruptness of the dome's collapse.  However,

---

[2]     Specifically, this Court found the following language from *E. River* to be persuasive:

> Nor do we find persuasive a distinction that rests on the manner in which the product is injured.  We realized that the damage may be qualitative, occurring through gradual deterioration or internal breakage.  Or it may be calamitous . . . But either way, since by definition no person or other property is damaged, the resulting loss is purely economic.  Even when the harm to the product itself occurs through an abrupt, accident-like event, [if no person or other property is damaged], the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain–traditionally the core concern of contract law.

*Wade*, 686 F. Supp. 2d at 187 (quoting *E. River Steamship Corp.*, 476 U.S. at 870); *see also Trans Hudson Express, Inc. v. Nova Bus Co.*, 06-CV-4092, 2007 WL 1101444, at *5 (D.N.J. Apr. 11, 2007) (noting that, in light of the Supreme Court's *E. River* decision, "it is reasonable to assume that the New Jersey Supreme Court would . . . reject[] the 'sudden and calamitous' exception to the economic loss doctrine").

the Court agrees with Underwriters that a dome, which in this case houses expensive equipment and hosts public events, is capable of enhancing damages, or producing "catastrophic consequences," to person or property in the event of an accident due to a defective design. Nonetheless, this is but one factor to consider. As a result, the Court will now turn to Plaintiffs' other arguments on this issue.

## 2. "Other Property"

As part of its alleged damages, Underwriters seek recovery for damages to "other property," such as replacement of the turf field and the dome's roof panels.[3] This Court recognized in *Wade*, that, "[s]ince the Supreme Court decided [*Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875 (1997)], decisions by other courts (including courts applying New York law) have made clear that, when a product causes damage not only to itself, but to 'other property,' tort liability is 'generally present.'" *Wade*, 686 F. Supp. 2d at 188 (collecting cases).

In *Wade*, this Court held that contents inside a recreational vehicle that were damaged after the vehicle caught fire were separate and apart from the motor home and therefore constituted other property. *Id.* at 189; *see also Saratoga*, 520 U.S. at 875 (holding that fishing equipment added to a vessel by purchaser that was subsequently destroyed when vessel sank due to a fire was "other property" rather than part of the product itself); *2-J Corp v. Tice*, 126 F.3d 539, 544 (3d Cir. 1997) (holding that a purchaser of a warehouse may recover in tort from the

---

[3] It should be noted that, in Underwriters' memorandum of law, they argue that additional miscellaneous items sustained damage due to the dome's collapse. (Dkt. No. 66, at 10.) According to Underwriters, these items, which include golf carts, soccer goals, fencing batting cages, garbage barrels, and lights, should also be classified as "other property." (*Id.*) However, it is undisputed that damage to these items were fully reimbursed through an insurance policy issued by Peerless Ins. Co./Inland Marine. In addition, Plaintiffs do not mention these items in their respective Complaints as a basis for their alleged damages. Therefore, the Court will not consider these items for purposes of its analysis.

manufacturer of the warehouse for damages caused to the contents of the warehouse after the warehouse collapsed).

Here, Defendant argues that the turf field and ballasts were appurtenances to the dome itself and, therefore, should not be considered separate items or "other property." (Dkt. No. 58, ¶ 69 [Bundschuh Decl.].)  With respect to the "roof panels," or ballasts, the Court is unable to determine, with any specificity, the items which Underwriters seek recovery.  As discussed above, Underwriters allege damages for the costs associated with replacing the dome's roof panels.  However, it is unclear from the evidence submitted, what the roof panels consist of and whether they are light ballasts as Defendant contends.  Nonetheless, the Court agrees with Defendant that roof panels, or light ballasts, that are attached to the dome's ceiling, should be considered a part of the dome itself rather than "other property."  This is because a roof panel or light ballast is a component of the dome.  *See Trump Int'l Hotel & Tower v. Carrier Corp.*, 524 F. Supp. 2d 302, 309 (S.D.N.Y. 2009) (holding that component parts to product and product itself are one integrated unit).  Moreover, Defendant agreed, as part of the parties' contract, to supply and install hanging light fixtures from the dome's ceiling. (Dkt. No. 55, Attach. 25, at 2-3, 5.)  Accordingly, any damages related to the replacement of roof panels or light ballasts are remediable through the parties' contract.

However, with respect to damages associated with the replacement of the turf field, there is no evidence in the parties' contract that Defendant contracted to supply a turf field to ADSC. (Dkt. No. 55, Attach. 25.)  Indeed, Mr. Miller testified at his deposition that he purchased the turf field from a company called ProGreen and that it did not come as part of "the package with the dome."  (Dkt. No. 58, Attach. 7, at 153:19-22.)  *See 126 Newton St., LLC*, 121 A.D.3d at 652

(holding that structural elements of a building damaged by water intrusion caused by defective windows and doors constituted "'other property' that was not the subject of the parties' agreement and, accordingly, support a valid tort cause of action").   Furthermore, the turf field is completely distinct from the dome itself because it was not affixed to the dome or otherwise integral to the dome's functioning.   Therefore, the turf field constitutes "other property."

### 3.     Negligent Misrepresentation

An exception to the economic loss rule exists where a plaintiff can establish that a special relationship existed between the parties in the context of a negligent misrepresentation claim. *See Travelers Cas. & Sur. Co. v. Dormitory Auth.–State of New York*, 734 F. Supp. 2d 368, 378 (S.D.N.Y. 2010) (noting that "before a party may recover in tort for pecuniary loss sustained as a result of another's negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity"); *Nebraskaland, Inc. v. Sunoco, Inc.*, 10-CV-1091, 2011 WL 6131313, at *4 (E.D.N.Y. July 13, 2011) (noting that "courts have relied on the existence of a special relationship that justified an exception to the economic loss doctrine"); *RKB Enter. Inc. v. Ernst & Young*, 182 A.D.2d 971, 972 (N.Y. App. Div. 3d Dept. 1992) (holding that "lack of a separate relationship distinct from and independent of the contract precludes a claim of negligent misrepresentation").

> Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000) (citing *King v. Crossland Savs. Bank*, 111 F.3d 251, 257-58 [2d Cir. 1997]); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (N.Y. 2011).

To determine the existence of a special relationship and duty in the context of a negligent misrepresentation claim, the Second Circuit has held that New York law requires a fact finder to consider the following three factors: (1) whether the person making the representation held or appeared to hold unique or special expertise; (2) whether a special relationship of trust or confidence existed between the parties; and (3) whether the speaker was aware of the use to which the information would be put and supplied it for that purpose. *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001); *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 525-26 (S.D.N.Y. 2014); *Fleet Bank v. Pine Knoll Corp.*, 290 A.D.2d 792, 795 (N.Y. App. Div. 3d Dept. 2002). In *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (N.Y. 1996), the New York Court of Appeals explained that, "[i]n the commercial context, a duty to speak with care exists when the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information." *Kimmell*, 89 N.Y.2d at 263.

"In general, a simple commercial relationship, such as that between a buyer and seller or franchisor and franchisee, does not constitute the kind of 'special relationship' necessary to support a negligent misrepresentation claim." *Century Pac., Inc. v. Hilton Hotels Corp.*, 03-CV-8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004) (citing *Dimon, Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 373 [S.D.N.Y. 1999]). However, "[t]he essential aspects of the requisite special relationship . . . 'may not be precisely defined.'" *Dimon*, 48 F. Supp. 2d at 373 (quoting *Polycast*

*Tech. Corp. v. Uniroyal, Inc.*, 87-CV-3297, 1988 WL 96586 [S.D.N.Y. Aug. 31, 1988]).

Nonetheless, "[a] commercial relationship may become a special relationship . . . where 'the

parties . . . enjoy a relationship of trust and reliance closer . . . than that of the ordinary buyer and

seller.'" *Century Pac.*, 2004 WL 868211, at *8 (quoting *Polycast Tech.*, 1988 WL 96586, at

*10). "Courts have found a special relationship and duty, for example, where defendants sought

to induce plaintiffs into a business transaction by making certain statements or providing specific

information with the intent that plaintiffs rely on those statements or information." *Id.*

Here, Underwriters and ADSC argue that a special relationship existed for the following

reasons: (a) Defendant markets itself as an expert in the field of dome design and construction;

(b) Mr. Schmidt was clearly aware that both Mr. Miller and the Town of Queensbury's Building

& Codes office sought, and intended to rely upon, factually correct information regarding snow

load capabilities of the dome for a serious purpose; and (c) Defendant and ADSC had a pattern of

close contact with each other regarding the operation of the dome. (Dkt. No. 66, at 24-25

[Underwriters' Opp'n Mem. of Law]; Dkt. No. 69, Attach. 9, at 26-27 [ADSC's Opp'n Mem. of

Law.].)

As an initial matter, any alleged misrepresentations made by Mr. Schmidt regarding snow

load calculations in 2005 are now time-barred. New York applies a three-year statute of

limitations for negligence actions, N.Y.C.P.L.R. § 214, and a six-year statute of limitations for

actions based upon a contractual obligation, N.Y.C.P.L.R. § 213(2). Furthermore, "[t]he statute

of limitations for negligent misrepresentation starts on the date of the alleged misrepresentation."

*Gander Mountain Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 368 (N.D.N.Y. 2013)

(D'Agostino, J.); *Calcutti v. SBU, Inc.*, 224 F. Supp. 2d 691, 702 (S.D.N.Y. 2002). Mr.

Schmidt's alleged misrepresentation regarding the snow load calculations occurred in July 2005 (Dkt. No. 58, Attach. 25), the contract was signed by the parties in July 2005 (Dkt. No. 58, Attach. 22, at 7), and ADSC executed the Acknowledgment of Receipt of Goods in December 2005 (Dkt. No. 58, Attach. 27). Therefore, because Underwriters did not file their Complaint until 2012, and ADSC did not file its Complaint until 2013, any misrepresentations made by Mr. Schmidt in 2005 are now time barred under both the three-year and six-year statutory periods.

However, with respect to Plaintiffs' remaining arguments, Plaintiffs adduce evidence that Sam Hayhoe, a Farley employee, advised Mr. Miller to perform a pressure fluctuation of the dome to break up the snow and ice that had accumulated. (Dkt. No. 58, Attach. 9, at 329:16-24 [Miller Dep.].) Underwriters claim that, upon performing the pressure fluctuation method, the dome suffered a partial collapse. (Dkt. No. 66, at 25 [Underwriters' Opp'n Mem. of Law].) However, during his deposition, Mr. Hayhoe denied giving Mr. Miller any advice related to performing a pressure fluctuation of the dome. (Dkt. No. 58, Attach. 15, at 48:22-49:1, 46:12-19 [Hayhoe Dep.].)

Applying the three factors discussed in *Suez Equity*, the Court agrees that a genuine dispute of material fact exists regarding this issue. *Suez Equity*, 250 F.3d at 103 (stating that "whether a special relationship exists between two parties is an issue of fact"). Specifically, the Court agrees that the design and construction of domes is unique and that Defendant possesses specialized expertise in this area. Second, the Court cannot conclude as a matter of law, based on the current record, that a special relationship of trust or confidence did not exist between the parties with respect to operation of the dome. Although the parties did not enter into a service agreement and Mr. Miller testified he was solely responsible for the day-to-day operations of the

61

dome, it is evident from the undisputed facts that Mr. Miller reached out to Farley occasionally over the course of several years for advice and suggestions regarding the removal of snow. *Cf. Trump Int'l Hotel & Tower*, 524 F. Supp. 2d at 313 (holding that "[a]lthough it is alleged that Carrier owed an 'independent duty' to Trump to properly advise it regarding the use and operation of the two chillers, no such independent duty existed. The duties Carrier owed to Trump originated from the Service Agreement and nowhere else."). The dome is a large and sophisticated product with which Mr. Miller lacked experience before his purchase. Certainly, it is reasonable to believe that Mr. Miller would defer to Farley's advice regarding the dome's operation in situations where he was unable to solve a problem himself. Under these circumstances, a reasonable person could conclude that a special relationship in the form of trust and confidence existed between the parties. Finally, with respect to the third prong, Farley certainly knew that Mr. Miller was contacting it for advice regarding the dome's operation and removal of snow and that Mr. Miller would likely use the information it provided for that purpose.

Similarly, the Court is unable to determine as a matter of law, based on the current record, whether Mr. Miller actually relied on the information provided to him by Farley immediately preceding the dome's collapse. It is clear from the undisputed facts that Mr. Miller contacted Farley seeking advice for removing the significant accumulation of snow on top of the dome. According to Mr. Miller, either Mr. Hayhoe or Jason Aljoe responded by suggesting Mr. Miller use the pressure fluctuation method to remove the snow. (Dkt. No. 58, Attach. 12, at 105:17-125 [Miller EUO].) It is undisputed that Mr. Miller lowered the pressure, causing the snow to shift, which, in turn, caused the dome to partially collapse due to the added weight of the snow in one

62

location.  (Part I.D. of this Decision and Order at ¶ 184 [Statement of Facts].)  Whether Mr. Miller did so based on the guidance and information allegedly given to him by Farley representatives is a dispute of material fact that cannot be determined as a matter of law. Accordingly, Defendant's motion for summary judgment with respect to Plaintiffs' claims for negligent misrepresentation and/or advice is denied.

### 4.    Independent Duty of Care

The New York Court of Appeals has stated that "[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.  This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987); *Avazpour Networking Servs., Inc. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 361 (E.D.N.Y. 2013).  New York courts have found that a contractor owes a common law tort duty to perform a contract non-negligently.  *See, e.g.*, *Hydro Inv'rs*, 227 F.3d at 17-18 (finding that engineers owed professional duty to complete work with reasonable care); *cf. Anunziatta v. Orkin Exterminating Co.*, 180 F. Supp. 2d 353, 359 (N.D.N.Y. 2001) (finding that exterminator had independent duty of reasonable care in treating home for termites, which was separate from its contractual duties); *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 552-53 (N.Y. 1992) (finding that fire alarm manufacturer owed independent duty to plaintiffs where fire alarm failed to transmit signal to fire department and caused a delayed response to building fire); *Syracuse Cablesystems, Inc. v. Niagara Mohawk Power Co.*, 173 A.D.2d 138, 142 (N.Y. App. Div. 4th Dept. 1991) (finding that Niagara Mohawk had a duty to protect plaintiffs where negligent operation of power transformer led to explosion and PCB contamination).

"However, this duty only applies to the 'limited class of cases in which a strong public interest in the careful performance of particular contractual obligations may give rise to a tort duty of due care.'" *Hartford Fire Ins. Co.*, 2011 WL 4463338, at *5 (quoting *Pfizer, Inc. v. Stryker Corp.*, 02-CV-8613, 2003 WL 21660339, at *2 [S.D.N.Y. July 15, 2003] [citing *Sommer*, 79 N.Y.2d at 540]); *see also Vigilant Ins. Co. v. ADT Sec. Servs., Inc.*, 10-CV-3066, 2011 WL 855874, at *3 (S.D.N.Y. Mar. 9, 2011) (holding that alarm company did not owe a duty of care apart from contract because, unlike the fire company in *Sommer*, ADT was not "franchised and regulated" by New York City).

In *Hydro Inv'rs*, a case relied upon by ADSC, the Second Circuit ruled that the economic loss rule would not bar a malpractice case brought by owners of a hydroelectric power plant against an engineering firm and an individual employed by the firm. The Circuit noted that the damages involved were distinct from those anticipated by the underlying contractual agreement and that the parties' relationship was not exclusively "economic in nature." *Hydro Inv'rs*, 227 F.3d at 17. Noting conflicting rulings surrounding the economic loss doctrine, the Circuit ruled that "the better course is to recognize that the rule allows such recovery in the limited class of cases involving liability for the violation of a professional duty. To hold otherwise would in effect bar recovery in many types of malpractice actions." *Id.*

Similarly, in *Anunziatta* and *Sommer*, the failure to exercise due care under specialized service contracts gave rise to tort claims akin to professional malpractice, where negligent performance would foreseeably lead to substantial damages. *See Anunizatta*, 180 F. Supp. 2d at 358 ("[Termite extermination company] held itself out to be a reliable professional, capable of performing the job in a careful, professional manner. Thus, [it] was obliged to use reasonable

care, as it was clear plaintiffs were relying on [it] to complete the treatment of their home with due care."); *Sommer*, 79 N.Y.2d at 552-53 ("[F]ailure to perform the [fire alarm relay] service carefully and competently can have catastrophic consequences."). In *La Barre v. Mitchell*, 256 A.D.2d 850 (N.Y. App. Div. 3d Dept. 1998), and *Village of Groton v. Tokheim Corp.*, 202 A.D.2d 728 (N.Y. App. Div. 3d Dept. 1994), two cases relied upon by Underwriters, the New York Appellate Division held that tort claims could proceed because of the danger attendant to the use of the products and that plaintiffs were also seeking damage to other property. *La Barre*, 256 A.D.2d at 655; *Tokheim Corp.*, 202 A.D.2d at 729.

Although there are similarities between these cases and the present case, significant differences exist, including that plaintiffs in those cases alleged damages to "other property." *See Anunizatta*, 180 F. Supp. 2d at 358 (holding that, where termite infestation was capable of destroying plaintiffs' home, "the injury would not be one merely to the product itself, as is the case when a good is purchased but does not perform as expected, but harm would result to the home of the plaintiffs as well"); *Sommer*, 79 N.Y.2d at 553 (finding that, as a result of the defective fire alarm system, there was extensive property damage due to fire that spread out of control); *La Barre*, 256 A.D.2d at 655 (finding that defective fire alarm caused delay in fire department's response, which in turn allowed fire to cause extensive damage to commercial building and its contents); *Village of Groton*, 202 A.D.2d at 729 (holding that "[t]he injury was not solely injury to the fuel dispensing system itself, but consisted of physical injury to plaintiff's property caused by the contamination of surrounding oils and ground water."). Here, with the exception of Underwriters' claim regarding replacement of the turf field, Plaintiffs largely seek purely economic damages as a result of the dome's failure to meet ADSC's expectations, rather

than damages related to personal injury or property damage beyond the dome itself. In such

instances, recovery in tort is inappropriate. *See Manhattanville Coll. v. James John Romeo*

*Consulting Eng'r, P.C.*, 28 A.D.3d 613, 616 (N.Y. App. Div. 2d Dept. 2006) ("When a plaintiff

seeks to recover damages for purely economic loss resulting from the failure or malfunction of a

product, such as the cost of replacing or retrofitting the product, or for damage to the product

itself, the plaintiff may not seek recovery in tort against the manufacturer or distributor of the

product, but is limited to a recovery sounding in breach of contract or breach of warranty.");

*Suffolk Laundry Servs. v. Redux Corp.*, 238 A.D.2d 577, 578 (N.Y. App. Div. 2d Dept. 1997)

(holding that, "where a product fails to perform as promised due to negligence in either the

manufacturing or installation process, a plaintiff is precluded from recovering tort damages for

its economic loss"); *Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F. Supp. 936, 939

(S.D.N.Y. 1989) (holding that an architectural firm owed an independent duty of care but then

barring plaintiff's malpractice claim because the damages alleged as a result of defendant's

malpractice were identical to the alleged contract damages).

Furthermore, it is evident that Defendant's duty in the present case arose from what was

negotiated in the contract. Specifically, with respect to the alleged defective design of the dome,

the parties had numerous conversations regarding the dome's design, specifications, and snow

load calculations. Moreover, the contract summarizes the materials and some of the

specifications used in designing the dome, including the language that "the air structure package

supplied as per items 1-6 will perform *at this location* for the intended use." (Dkt. No. 55,

Attach. 25, at 1-4) (emphasis added). Accordingly, any alleged deficiencies in the design of the

dome, and/or materials that were used, arise from the contract and do not create a legal duty

independent of the contract itself.  *See Clark-Fitzpatrick*, 70 N.Y.2d at 90 (holding that, where

plaintiff alleged that defendant failed to exercise "due care" in the design of a railroad project,

plaintiff's negligence allegations were "merely a restatement, albeit in slightly different language,

of the 'implied' contractual obligations asserted in the cause of action for breach of contract.

Moreover, the damages plaintiff allegedly sustained as a consequence of defendant's violation of

a 'duty of due care' in designing the project were clearly within contemplation of the written

agreement.").  Therefore, with the exception of Plaintiffs' negligent misrepresentation claims and

Underwriters' tort claims regarding the turf field, an independent duty of care did not exist,

which would support Plaintiffs' remaining tort claims as an exception to the economic loss rule.

### 5.     Failure to Warn

Plaintiffs allege that Defendant breached its duty to warn ADSC about the dangers arising

from the foreseeable uses of the dome, including how to operate the dome when accumulations

of snow and ice are present.  (Dkt. No. 1, ¶¶ 44-49; 13-CV-0385, Dkt. No. 1, ¶¶ 42-47.)

Furthermore, Plaintiffs allege that Defendant had been notified of inclement weather conditions

impacting the use of the dome beginning in 2006 and, therefore, had a duty to provide adequate

instructions and warnings regarding the safe use of the dome.  (*Id.*)

Courts outside of this Circuit have applied the economic loss rule to post-sale failure-to-

warn claims.  Specifically, in *Sea-Land Serv., Inc. v. Gen. Elec. Co.*, 134 F.3d 149 (3d Cir.

1998), the Third Circuit stated that,

> [w]here, however, damage from a defect is only to the product
> itself and is only economic, there is no tort recovery.  The policy of
> economic loss is better adjusted by contract rules than by tort
> principles.  This conclusion is as true for strict liability and
> negligence cases as it is for failure to warn cases.  Thus, a
> manufacturer may be culpable of a failure to warn, but if the
> damage is solely to the product itself and is solely economic, there
> is no tort recovery.

*Sea-Land Serv.,* 134 F.3d at 156; *accord, Turbomeca, S.A. v. Era Helicopters, LLC*, 536 F.3d 351, 354-57 (5ᵗʰ Cir. 2008) (interpreting the economic loss rule from *E. River* as a "broad bar to tort claims for damages solely to the product itself"); *Ace Am. Ins. Co. v. Grand Banks Yachts, Ltd.*, 587 F. Supp. 2d 697, 702-03 (D. Md. 2008) (holding that "*E. River*'s broad rule should encompass a negligent failure to warn cause of action" and extends to consumer transactions); *see also Nicor Supply Ships Assocs. v. Gen. Motors Co.*, 876 F.2d 501, 504-05 (5ᵗʰ Cir. 1989) (rejecting tort claim for failure-to-warn of a defect known at the time of manufacture); *cf. Rochester-Genesee Reg'l Trans. Auth. v. Cummins Inc.*, 09-CV-6370, 2010 WL 2998768, at *9 (W.D.N.Y. July 28, 2010) (holding that the duty to warn "creates an exception to the economic loss doctrine" under limited circumstances).

Accordingly, because Plaintiffs have alleged purely economic damages as a result of the dome's collapse, Plaintiffs' separate tort claims regarding Defendant's failure-to-warn are barred by the economic loss rule. Underwriters may proceed, however, with their failure-to-warn claim regarding damages associated with replacement of the turf field. *See Mays Towing Co. v. Universal Mach. Co.*, 755 F. Supp. 830, 834 (S.D. Ill. 1990) (holding that "Plaintiff, however, may proceed on its failure-to-warn claim for those damages to property other than the [product itself]").

### B.    Whether the Limitation-of-Liability Provision Precludes Consequential Economic Damages

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendant's declaration in support of its motion and Defendant's memorandum of law. (Dkt. No. 58, ¶¶ 143-154 [Bundschuh Decl.]; Dkt. No. 59, at 19-21 [Def.'s

Mem. of Law].)  To those reasons, the Court adds the following analysis.[4]

Section 2-719 of the N.Y.U.C.C. permits contracts for the sale of goods to contain limitations on the availability of consequential damages.  Section (3) provides as follows:

> Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable.  Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

Furthermore, the "parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect." N.Y.U.C.C. § 2-719, cmt. 1; *see also McNally Wellman Co. v. New York State Elec. & Gas Corp.*, 63 F.3d 1188, 1195 (2d Cir. 1995) ("It is axiomatic that parties to a contract must remain free to allocate risks and shield themselves from liability.").  "Therefore, unless the provision is unconscionable, a limitation or exclusion of consequential damages must be upheld by the Court." *Am. Tel. & Tel. Co. v. New York City Human Res. Admin.*, 833 F. Supp. 962, 988 (S.D.N.Y. 1993) (citing N.Y.U.C.C. § 2-719[3]).

### 1.      Whether the Subject Contract Is Unconscionable

"Whether a contract's terms are unconscionable is a matter of law to be determined in light of 'the background of the contract's commercial setting, purpose, and effect.'" *Xuchang Rihetai Human Hair Goods Co., Ltd. v. Hanyu Int'l USA Inc.*, 00-CV-5585, 2001 WL 883646, at *4 (S.D.N.Y. Aug. 7, 2001) (quoting *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 403-04 [N.Y. 1968]).  Furthermore, as stated by the court in *Am. Tel. & Tel. Co.*,

---

[4]      As discussed below in Part III.C.1. of this Decision and Order, the Court has determined that the parties' contract is predominantly one for the sale of goods.  As a result, the N.Y.U.C.C. governs the parties' contract, which, in turn, will govern the Court's analysis regarding the enforceability of the limitation-of-liability provision.

> "[A] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made–i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."
>
> With respect to the procedural element of unconscionability, the Court must engage in "an examination of the contract formation process and the alleged lack of meaningful choice." Thus, "the focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressure tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." With respect to substantive unconscionability, "this question entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." In *Cayuga Harvester, Inc.*, the court noted "[i]n cases involving transactions of a commercial nature, courts have rarely found unconscionability, and it has been held that when businessmen contract in a commercial setting, a presumption of conscionability arises."

*Am. Tel. & Tel. Co.*, 833 F. Supp. at 988 (quoting *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10-11 [N.Y. 1988]; *Cayuga Harvester, Inc. v. Allis-Chalmers Corp.*, 95 A.D.2d 5, 20 [N.Y. App. Div. 4th Dept. 1983]).

Here, the limitation-of-liability provision states, in relevant part, that

> [Farley] shall not be liable in contract or tort (including negligence) for loss of profits or revenues, loss of use of equipment or facilities, cost of capital, or for any nature resulting from or in any manner relating to the air supported structure covered hereby, its design, use, any inability to use the same or any delay in delivery of same.

(Dkt. No. 58, Attach. 22, at 15; Dkt. No. 58, Attach. 23; Dkt. No. 58, Attach. 24.) ADSC argues that Mr. Miller trusted and relied upon Defendant's expertise in designing and building a

structure suitable for a business in which Mr. Miller had never been involved before. (Dkt. No. 69, Attach. 9, at 24-25 [ADSC's Opp'n Mem. of Law].) ADSC notes that Mr. Miller was a former high school teacher and Niagara Mohawk employee who was making his first venture into the sports hosting business, while Defendant markets itself as an expert in the field of design and construction of domes. (*Id.* at 25-26.)

The Court is unpersuaded that these facts constitute sufficient grounds on which to find the limitation-of-liability provision unconscionable. First, Mr. Miller testified at his deposition that he received the warranty containing the limitation-of-liability provision before signing the contract. (Dkt. No. 58, Attach. 7, at 172:2-5 [Miller Dep.].) Furthermore, Mr. Miller understood that the warranty was part of the agreement with Defendant when he executed the contract. (*Id.* at 172:6-9.) If Mr. Miller or ADSC had any concerns regarding the provision, they certainly could have objected to it or negotiated that it not be included in the contract.

Second, the provision was sufficiently conspicuous, using bold, underlined, and capital letters to alert the reader of its presence. *See* N.Y.U.C.C. § 1-201(10). Third, although this was Mr. Miller's first experience in this area of business, Mr. Miller is sufficiently educated to read and understand the meaning of the provision. *See*, *supra*, Part I.D. at ¶ 5 of this Decision and Order (stating that Mr. Miller is college educated with degrees in physical education, sports medicine and mechanical engineering and that he also has a post-graduate degree in sports medicine).

Fourth, ADSC has not presented any evidence that Defendant exerted pressure on Mr. Miller to sign the contract or agree to terms with which he felt uncomfortable. Indeed, as Defendant points out, Farley was one of three manufacturers with which Mr. Miller was

negotiating before entering into the contract.  Mr. Miller and ADSC could have easily decided to contract with another manufacturer if they were not happy with the contract terms or the way they were being treated.

Fifth, and finally, the exclusion of "consequential damages was not unreasonably favorable to [Defendant] in that it did not disturb the 'substantial value of the bargain.'" *McNally Wellman Co.*, 63 F.3d at 1198 (citing N.Y.U.C.C. § 2-719 cmt. 1).

Accordingly, ADSC has not presented sufficient evidence demonstrating that the limitation of liability provision is unconscionable.

### 2. Whether Public Policy Prohibits Enforcement of the Limitation-of-Liability Provision

Next, ADSC argues that the limitation-of-liability provision should be deemed unenforceable on the basis that it violates public policy considerations.  Specifically, ADSC cites a line of cases holding that an exculpatory clause "will not be enforced where it purports to exempt liability for willful or grossly negligent acts or where a special relationship exists between the parties so that an overriding public interest renders the exculpatory clause unenforceable." *Commercial Union Ins. Co. v. Blue Water Yacht Club Ass'n*, 239 F. Supp. 2d 316, 321 (E.D.N.Y. 2003) (citing *Lago v. Krollage*, 78 N.Y.2d 95 [N.Y. 1991]); *Falcone v. MarineMax, Inc.*, 659 F. Supp. 2d 394, 399-400 (E.D.N.Y. 2009).  Based upon this precedent, ADSC argues that, at a minimum, there is a question of fact regarding the gross negligence of Defendant's lead designer, Mr. Schmidt, when he intentionally made false representations to ADSC and the local building department with respect to the dome's ability to withstand local snow accumulations.  (Dkt. No. 69, Attach. 9, at 24-25 [ADSC's Opp'n Mem. of Law].)

Initially, it should be noted that exculpatory clauses, as discussed in the cases cited by ADSC, are different from limitation-of-liability clauses. *See Valhal Corp. v. Sullivan Assocs, Inc.*, 44 F.3d 195, 202-03 (3d Cir. 1995) (noting that, under Pennsylvania law, the same stringent standards developed for exculpatory, hold harmless and indemnity clauses do not apply to limitation-of-liability provisions). Generally speaking, "[e]xculpatory clauses seek to shield a company from any liability. Limitations of liability, on the other hand, seek to do precisely what the term suggests: limit, rather than exempt[,] a company from liability." Michael Pillow, *Clashing Policies or Confusing Precedents: The "Gross Negligence" Exception to Consequential Damages Disclaimers*, 4 Wm. & Mary Bus. L. Rev. 493, 503-04 (2013).

Furthermore, the Second Circuit has expressly held that N.Y.U.C.C. § 2-719 displaces the common law. *McNally Wellman Co.*, 63 F.3d at 1196. In *McNally*, the Circuit noted that "New York courts have held specifically that the UCC displaces the common law when the particular section at issue produces a result that would be contrary to that obtained under ordinary contract law." *Id.* (citing *Horn Waterproofing Corp. v. Bushwick Iron & Steel Co.*, 66 N.Y.2d 321 [N.Y. 1985]; *Ap Propane v. Sperbeck*, 157 A.D.2d 27 [N.Y. App. Div. 3d Dept. 1990]); *see also PC COM, Inc. v. Proteon, Inc.*, 946 F. Supp. 1125, 1139 (S.D.N.Y. 1996) (holding that, "in situations where the U.C.C. would produce a different result from traditional common law, the U.C.C. displaces the common law"). Additionally, "[s]ection 2-719(3) of the UCC, which governs exclusions of consequential damages, directs the enforcement of such clauses unless they are unconscionable, and *the provision contains no other explicit exceptions*." *McNally Wellington Co.*, 63 F.3d at 1196 (emphasis added).

Therefore, the Court finds that the limitation-of-liability provision is not unconscionable, that the provision is enforceable and that, as a result, ADSC is precluded from seeking recovery for consequential economic damages. However, this determination has no effect on ADSC's negligent misrepresentation and/or advice claim. This is because the limitation-of-liability provision is limited to the design and erection of the dome. Moreover, Plaintiffs' negligent misrepresentation claims stem from a special relationship between the parties, which existed over the course of several years from the time of the dome's erection to its partial collapse. This relationship was extraneous and separate from the contract. Therefore, having found that ADSC's claims and damages (with the exception of its' negligent misrepresentation claim) are precluded by the economic loss rule and the limitation-of-liability provision, the Court will now focus solely on Underwriters' claims for damages related to replacement of the turf field.

### C. Whether Underwriters' Claims for Breach of Implied and Express Warranties and Breach of Contract Are Barred by the Statute of Limitations

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendant's declaration in support of its motion and Defendant's memorandum of law. (Dkt. No. 58, ¶¶ 118-42 [Bundschuh Decl.]; Dkt. No. 59, at 13-18 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

### 1. Whether the Parties' Contract Is One for the Sale of Goods

As an initial matter, the Court must determine whether the contract in the present case was one for the sale of goods, thereby bringing it under the governance of the N.Y.U.C.C., or whether it is subject to the longer statute of limitations period set forth in N.Y.C.P.L.R. § 213. Claims arising from the sale of goods "are governed by the four-year statute of limitations set

forth in § 2-725 of the N.Y.U.C.C." *Jackson v. Eddy's LI RV Ctr., Inc.*, 845 F. Supp. 2d 523, 531

(E.D.N.Y. 2012). "While claims for breach of contract under New York law are generally

covered by a six year statute of limitations, that limitations period does not apply where . . . the

contract at issue is for the sale of goods and is therefore governed by the U.C.C." *Jackson*, 845 F.

Supp. 2d at 531 (citing N.Y.C.P.L.R. § 213). In other words, the U.C.C. "applies to transactions

involving goods, but its provisions . . . are not applicable to either 'service' or 'construction'

contracts." *Hunter's Run Stables, Inc. v. Triple H Constr. Co., Inc.*, 938 F. Supp. 166, 168

(W.D.N.Y. 1996) (quoting *Schenectady Steel Co., Inc. v. Bruno Trimpoli Gen. Constr. Co., Inc.*,

43 A.D.2d 234 [N.Y. App. Div. 3d Dept. 1974]).

"In determining whether the violation of a contract providing both for the sale of goods

and for the furnishing of services is controlled by the four-year statute of limitations of U.C.C. §

2-725 or the six-year statute of limitations in N.Y.C.P.L.R. § 213(2), the test is whether the

contract is 'predominantly' one for the sale of goods or for the providing of services." *Alesayi*

*Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 666-67 (S.D.N.Y. 1996) (citing *Levin v.*

*Hoffman Fuel Co.*, 94 A.D.2d 640 [N.Y. App. Div. 1st Dept. 1983]). "If the provision of services

or rendering of other performance predominates and is not merely incidental or collateral to the

sale of goods, then the U.C.C. does not apply." *Alesayi*, 947 F. Supp. at 667 (citing *Compania*

*Sud-Americana de Vapores v. IBJ Schroder Bank & Trust*, 785 F. Supp. 411, 431 n.19 [S.D.N.Y.

1992]); *see also Long Island Lighting Co. v. IMO Indus. Inc.*, 6 F.3d 876, 888 (2d Cir. 1993).

"This inquiry depends heavily on the facts and terms peculiar to that contract." *Alesayi*, 947 F.

Supp. at 667 (citing *McNally Wellman Co. v. New York State Elec. & Gas Co.*, 6 F.3d 1188, 1194

[2d Cir. 1995]). However, "[t]here may be agreements in which it is difficult to determine from

the face of the agreement whether the sale of goods or the promise to provide service is predominant, and as to which surrounding circumstances may be decisive in resolving that question." *Levin*, 94 A.D.2d at 641.

Section 2-105(1) and (2) of the U.C.C. define "good" as follows:

> (1) "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (Section 2-107).

> (2) Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are "future" goods. A purported present sale of future goods or of any interest therein operates as a contract to sell.

Furthermore, U.C.C. § 2-106(1) provides the following:

> In this Article unless the context otherwise requires "contract" and "agreement" are limited to those relating to the present or future sale of goods. "Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price (Section 2-401). A "present sale" means a sale which is accomplished by the making of the contract.

In the present case, Defendant argues, in part, that the dome is a "good" because, at the time of the dome's manufacture, it was movable and remains movable today. (Dkt. No. 58, ¶¶ 119-21 [Bundschuh Decl.].) As discussed above in Part I.E.2. and I.E.3. of this Decision and Order, Plaintiffs contend that the dome is a permanent structure with an unmovable concrete foundation and the contract between ADSC and Defendant was one for construction and/or services. (Dkt. No. 66, at 20-23 [Underwriters' Opp'n Mem. of Law]; Dkt. No. 69, Attach. 9, at 22-23 [ADSC's Opp'n Mem. of Law].)

As an initial matter, Defendant asserts in its Statement of Material Facts that "[t]he air-supported structure manufactured by Farley is a temporary structure that can be moved. ADSC considers the air-supported structure temporary for accounting and tax purposes." (Dkt. No. 57, ¶ 212.) The Court deems this fact admitted, in part, because (1) Underwriters admitted this fact (Dkt. No. 67, ¶ 212) and (2) ADSC failed to cite record evidence that controverted this fact (Dkt. No. 69, Attach. 7, ¶ 212). Instead, ADSC attached an exhibit of a handwritten tax worksheet in support of its contention that the dome "is a permanent structure and is being tax depreciated over 40 years." (Dkt. No. 69, Attach. 7, ¶ 212.) However, this worksheet was not accompanied by an affidavit and is not admissible record evidence.[5] Furthermore, no reference to the IRS Code or a statute was provided to support the contents of the document, nor does the document say anything about the dome being a permanent structure.

Conversely, Defendant provided citations to Mr. Miller's deposition transcript where he implicitly acknowledged that the dome is a temporary structure and movable. (Dkt. No. 57, ¶ 212.) Mr. Miller also testified that the dome is considered a temporary structure and not a permanent building for accounting and tax purposes. (Dkt. No. 58, Attach. 7, at 59:9-60:5 [Miller Dep.].) Finally, Mr. Miller also testified during his deposition that, at one point, he considered moving the "whole facility, the whole business to a different location." (Dkt. No. 58, Attach. 10, at 490:17-492:6 [Miller Dep.].) Accordingly, the Court finds that the dome was movable at the time of its identification to the contract and is therefore a "good" as defined by U.C.C. § 2-105(1).

---

[5]     "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y.L.R. 7.1(a)(3).

Next, the Court must determine whether the contract was primarily one for services or goods. The contract reveals that Defendant agreed to provide ADSC with "one Air Structure approximately 432' long x 225' wide x 68' high, plan as per finished drawings which will be signed and confirmed by Purchaser . . . ." (Dkt. No. 55, Attach. 25, at 1.) The contract states that ADSC agrees to pay for the dome, including, among other things, the following main component parts: (1) the dome's main outer and inner "fabric membrane"; (2) "doors and other access components"; (3) "lighting"; (3) "mechanical equipment"; and (4) "air structure retention," including a "retention channel" and "restraining cables." (Dkt. No. 55, Attach. 25, at 1-4.)

Significantly, according to the terms of the contract, Defendant agreed to be responsible for the following: (1) delivery of all components to project site; (2) supervisory personnel to direct installation; (3) attachment of membranes to profile hardware; (4) installation of doors, airlocks and catenaries as required; (5) startup and operational check of furnace, inflator, and emergency backup systems; (6) installation and assembly of lighting poles, including light fixtures if included in contract; (7) inflation and stabilization of air structure; (8) air structure will be prepared to facilitate installing insulation between inner and outer membranes; and (9) operational instruction and review of Operating & Maintenance Instruction Manuel requirements with Purchaser and/or Purchaser's designates. (Dkt. No. 55, Attach. 25, at 5-6.)

ADSC agreed to perform the following relevant responsibilities: (1) obtaining and paying for all permits; (2) excavation, site grading and landscaping; (3) furnishing and placement of concrete grade beam, equipment pads, and all concrete work required to meet plans and specifications; (4) installation of cable attachment anchors in grade beam; and (5) supply of temporary labor required by the Supplier and equipment as requested by the Supplier to effect

installation of air structure and equipment including unloading at the site. (Dkt. No. 55, Attach. 25, at 5.) Furthermore, Paragraph "F" of the contract states that "Purchaser is responsible for all site preparations, site access, on-site crane, unloading at site, placement of structure and components." (Dkt. No. 55, Attach. 25, at 6.)

It has been held that "[c]ontracts for goods which involve–incident to the sale of goods–services such as installation, maintenance, testing, instruction or supervision are still subject to the UCC." *KSW Mech. Servs. v. Johnson Controls, Inc.*, 992 F. Supp. 2d 135, 141 (E.D.N.Y. 2014) (citing *Richard A. Rosenblatt & Co., Inc. v. Davidge Data Sys. Corp.*, 295 A.D.2d 168 [N.Y. App. Div. 1st Dept. 2002]). Furthermore, "'contracts for the sale of sophisticated equipment frequently provide for some initial supervision, testing and instruction by the manufacturer,' and these contracts are nevertheless governed by the UCC because they primarily concern the sale of goods." *KSW Mech. Servs.*, 992 F. Supp. 2d at 141 (quoting *Richard A. Rosenblatt & Co., Inc.*, 295 A.D.2d at 168); *accord*, *J.I. Hass Co., Inc. v. Frank A. Kristal Assocs., Inc.*, 127 A.D.2d 541, 542 (N.Y. App. Div. 1st Dept. 1987). As other courts have observed, labor is "an input into the manufacture of every good." *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 655 (7th Cir. 1998). Moreover, "[m]anufacture always involves some services, such as engineering, design, fabrication and inspection." *Propulsion Tech., Inc. v. Attwood Corp.*, 369 F.3d 896, 901 (5th Cir. 2004). "The fact that a manufactured item is custom designed for the buyer's needs and is not readily marketable to others is not dispositive–manufactured goods are still 'goods.'" *Propulsion Tech.*, 369 F.3d at 901.

Based upon the foregoing, the Court is persuaded that the parties' contract was predominantly one for goods rather than services and/or construction. First, as discussed above, the dome was movable at the time of its identification to the contract. Second, the contract called

for Defendant to provide "one Air Structure" according to the specifications agreed upon by the parties.  Any services rendered by Defendant in connection with the erection of the dome, training of staff in its use and operation, connection to the grade beam, and connection of mechanical systems were ancillary to the purpose of the contract.  Furthermore, it is undisputed that the parties never entered into a service agreement, nor was Defendant ever retained to perform routine maintenance, service or inspections of the dome.  Rather, the day-to-day operation and maintenance of the dome and its mechanical support systems is wholly Mr. Miller's responsibility and has been since the time of its erection.

Underwriters attempt to distinguish between the components that were furnished by Defendant and the dome itself, arguing that, "while the components making up the product may constitute goods, the fully assembled, finished product is not a good as a matter of law." (Dkt. No. 66, at 22-23.)  Underwriters cite *Hunter's Run Stables*, arguing that, in that case, the court determined the main objective of the contract was the construction of a horse barn, not the sale of the goods necessary to construct it.  *Hunter's Run Stables*, 938 F. Supp. at 168.  Similarly, Underwriters cite *Rush v. Jack Anthony, Inc.*, 2011 NY Slip Op 31230(U) (N.Y. Sup. Ct. Nassau Cnty. Apr. 25, 2011), where the court held that "[a] completed swimming pool is not 'goods' within the meaning of the UCC.  While the component parts making up a pool kit may constitute goods, it is the fully assembled product of which plaintiffs complain." *Rush*, 2011 NY Slip Op 31230(U), at *5; *see also Schenectady Steel Co., v. Bruno Trimpoli Gen. Constr. Co., Inc.*, 43 A.D.2d 234, 237 (N.Y. App. Div. 3d Dept. 1974) (holding that "Respondent was not contracting simply for the steel beams but in essence for their erection and installation with the transfer of the title to the steel a mere incident of the overall transaction").  However, the finished products in

those cases involved permanent structures in the form of a horse barn and an in-ground swimming pool. *Cf. Corbin v. Coleco Indus., Inc.*, 748 F.2d 411, 414 (7th Cir. 1984) (holding that above-ground swimming pools are goods within the meaning of Article 2 of the U.C.C. under Indiana law). Indeed, in *Hunter's Run Stables*, the construction company made no attempt to argue that the disputed contract was a contract for goods. *Hunter's Run Stables*, 938 F. Supp. at 168.

The Court is persuaded that this matter is more akin to cases from other state courts applying identical provisions of the U.C.C., involving seemingly permanent structures. For example, in *Robertson Co., Inc. v. Kenner*, 311 N.W.2d 194 (N.D. 1981), the Supreme Court of North Dakota was tasked with deciding whether a contract was one for goods or services that involved the sale and erection of two galvanized steel grain storage facilities on a farm. *Robertson*, 311 N.W.2d at 199. The court held that the U.C.C. governed the contract, stating that

> Although the storage facilities are not 'goods' to be taken from the shelf, they are, in the words of the UCC, a movable thing specially manufactured. The fact that the storage facilities were in existence only as disassembled materials at the time of the execution of the contract, did not change their status as goods. These buildings, even upon full assembly, are capable of being detached from their foundations and are thus "movable."

*Id.* at 200; *see also Kline Iron & Steel Co., Inc. v. Gray Commc'n Consultants, Inc.*, 715 F. Supp. 135 n.2 (D.S.C. 1989) (applying U.C.C. § 2-105[1], determining that erection of a TV tower was sale of "goods," and noting that "[t]he various products were to be manufactured or ordered in advance by the plaintiff and shipped to the tower site where they would be erected by subcontractors hired by the plaintiff. Thus, they would clearly be movable at the time of identification of the contract"); *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water*

*Co.*, 532 F.2d 572, 580 (7th Cir. 1976) (applying Illinois law and holding that a one-million gallon water tank, that was designed and manufactured by defendant, was a "good"); *Gulf Coast Fabricators, Inc. v. Mosley*, 439 So.2d 36, 38 (Ala. 1983) (holding that pre-fabricated building was a "good" under Article 2 of the U.C.C.); *Entron, Inc. v. Gen. Cablevision of Palaka*, 435 F.2d 995, 1000 (5th Cir. 1970) (holding that contract for construction of cable television system was a contract for sale of goods); *Gruet v. Care Free Hous. Div. of Kenn-Sch. Enter.*, 305 A.D.2d 1060 (N.Y. App. Div. 4th Dept. 2003) (holding that "sale and delivery of a modular home is essentially a contract for the sale of goods governed by UCC article 2").

### 2.    Accrual and Application of Statute of Limitations to Underwriters' Breach-of-Warranty Claims

Accordingly, because the subject contract is predominantly one for the sale of goods, the U.C.C.'s four-year statute of limitations applies to Underwriters' claims for breach of implied and express warranties.[6]  Under N.Y.U.C.C. § 2-725(1) and (2), claims for breach of contract and warranty accrue at the time of delivery.  *Richard A. Rosenblatt & Co., Inc.*, 295 A.D.2d at 168; *Gianakakos v. Commodore Home Sys.*, 285 A.D.2d 907, 908 (N.Y. App. Div. 3d Dept. 2001); *Franklin Nursing Home v. Power Cooling, Inc.*, 227 A.D.2d 374 (N.Y. App. Div. 2d Dept. 1996).  Therefore, the date of injury is irrelevant.  *See Potomac Ins. Co. v. Rockwell Int'l Corp.*, 94 A.D.2d 763, 763 (N.Y. App. Div. 2d Dept. 1983); *Weinstein v. Gen. Motors Corp.*, 51 A.D.2d 335, 336-37 (N.Y. App. Div. 1st Dept. 1976).  Moreover, N.Y.U.C.C. § 2-725(2) specifically

---

[6]    The Court notes that, had ADSC been allowed to proceed with its breach of contract claim, the claim would have also been subject to the four-year statute of limitations period.  N.Y.U.C.C. § 2-725(1) ("An action for breach of any contract for sale [of goods] must be commenced within four years after the cause of action has accrued."); *accord*, *QK Healthcare, Inc. v. InSource, Inc.*, 108 A.D.3d 56, 65 (N.Y. App. Div. 2d Dept. 2013); *Laing Logging, Inc. v. Int'l Paper Co.*, 228 A.D.2d 843, 845 (N.Y. App. Div. 3d Dept. 1996); *Jackson*, 845 F. Supp. 2d at 531.

states that knowledge, or lack thereof, of a defect has no effect on the running of the statute. *See Vanata v. Delta Int'l Mach. Corp.*, 269 A.D.2d 175, 176 (N.Y. App. Div. 1st Dept. 2000). Nor do any attempts to repair a defective product toll the statute. *See Zielinski v. Alfa-Laval, Inc.*, 86-CV-0296, 1989 WL 29482, at *3-4 (W.D.N.Y. Mar. 27, 1989).

When a warranty explicitly extends to the future performance of the goods, a cause of action for breach of that warranty does not accrue until the breach occurs or should have been discovered. *See Weiss v. Herman*, 193 A.D.2d 383, 383 (N.Y. App. Div. 1st Dept. 1993); *accord*, *Wyandanch Volunteer Fire Co., Inc. v. Radon Constr. Corp.*, 19 A.D.3d 590, 591 (N.Y. App. Div. 2d Dept. 2005). This exception applies only to express warranties, not ones that are implied. *Rosen v. Spanierman*, 894 F.2d 28, 31-32 (2d Cir. 1990); *accord*, *Momentive Performance Materials USA, Inc. v. AstroCosmos Metallurgical, Inc.*, 659 F. Supp. 2d 332, 347-48 (N.D.N.Y. 2009) (Scullin, J.); *Orlando v. Novurania of AM., Inc.*, 162 F. Supp. 2d 220, 224 (S.D.N.Y. 2001). However, a warranty expressly limited to repair or replacement is not a warranty that extends to the future performance of goods. *Schwatka v. Super Millwork, Inc.*, 106 A.D.3d 897, 899 (N.Y. App. Div. 2d Dept. 2013); *accord*, *St. Patrick's Home for Aged & Infirm v. Laticrete Intern., Inc.*, 264 A.D.2d at 657. Finally, while the "tender" of goods is generally deemed to occur upon delivery, N.Y.U.C.C. § 2-503(1), the parties may alter the definition of "tender" by agreement, and thereby alter when a breach accrues. *City of New York v. Pullman, Inc.*, 662 F.2d 910, 919 (2d Cir. 1981); *St. Anne-Nackawic Pulp Co., Ltd. v. Research-Cottrell, Inc.*, 788 F. Supp. 729, 734 (S.D.N.Y. 1992).

In the present case, the date of "tender" of goods occurred no later than December 9, 2005.  This is the date that ADSC executed the Acknowledgment of Receipt of Goods provided by Defendant.  (Dkt. No. 58, Attach. 27.)  Pursuant to the parties' contract, ADSC could not use the dome until the Acknowledgment of Receipt of Goods was executed.  (Dkt. No. 58, Attach. 22, at 6 ¶ K.)  Furthermore, the warranty provided by Defendant was for repair and replacement of the dome and its component parts, not a warranty explicitly guaranteeing the performance of the dome for any length of time. (Dkt. No. 58, Attach. 22, at 15; Dkt. No. 58, Attach. 23; Dkt. No. 58, Attach. 24.)  Therefore, there was no warranty extending to the future performance of the dome, which could have tolled the applicable statute of limitations.

Therefore, because Underwriters did not file their Complaint until 2012 and ADSC did not file its Complaint until 2013, Underwriters' claims for breach of implied and express warranties are time barred by the applicable four-year statute of limitations.

**D.  Whether Underwriters' Claim for Defective and/or Negligent Design of the Dome Is Barred by the Statute of Limitations**

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Underwriters' memorandum of law.  (Dkt. No. 66, at 16-17 [Underwriters' Opp'n Mem. of Law].)  To those reasons, the Court adds the following analysis.

"The statute of limitations in New York for negligence claims is three years." *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 744 (2d Cir. 1979) (citing N.Y.C.P.L.R. § 214); *see also Victorson v. Bock Laundry Mach. Co.*, 37 N.Y.2d 395, 399 (N.Y. 1975) (holding that three-year statute of limitations applies to actions for strict products liability).  Furthermore, it is the date of injury, rather than the wrongful act of defendant or discovery of injury by

plaintiff, that is the relevant date for marking accrual of negligence or a products liability action. *Evans v. Visual Tech. Inc.*, 953 F. Supp. 453, 456 (N.D.N.Y. 1997); *accord*, *St. Patrick's Home for Aged & Infirm v. Laticrete Int'l, Inc.*, 264 A.D.2d 652, 654 (N.Y. App. Div. 1st Dept. 1999). In other words, "[a]n action accrues when a plaintiff can allege all of the legal elements that would allow her to seek redress for her injuries." *Evans*, 953 F. Supp. at 456 (citing *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 [N.Y. 1993]). As in all negligence claims, a plaintiff asserting a claim based on a design defect must all also allege injury and damages. *See Rogers v. Westfalia Assoc. Tech., Inc.*, 485 F. Supp. 2d 121, 126-27 (N.D.N.Y. 2007) (Sharpe, C.J.).

Here, Defendant contends that the statute of limitations accrued in 2007, when Mr. Miller first observed damage to the dome due to snow loads that caused cable pockets to rip. (Dkt. No. 58, ¶¶ 97-98 [Bundschuh Decl.].) However, the Court believes that the damages sustained as a result of ripped cable pockets and the dome's collapse are distinct from each other. Specifically, as discussed above, Plaintiffs have asserted claims regarding the dome's inability to withstand the snow load indicated in Defendant's snow load calculations and an improper height-to-width ratio in the dome's design. These claims are much broader than a design defect claim related to the longitudinal cables and the pockets that ripped. Moreover, because the Court has held that Underwriters' claim for damage to the turf field is the only claim that may proceed under a defective and/or negligent design theory of liability, Underwriters could not have alleged the requisite injury and damages to the turf field until the dome's collapse in 2011. Therefore, Underwriters' claim for defective and/or negligent design of the dome is not time-barred.

**E.      Whether a Genuine Dispute of Material Fact Exists Regarding Underwriters'**
         **Claim for Defective and/or Negligent Design of the Dome**[7]

After carefully considering the matter, the Court answers this question in the negative for

the reasons stated below.

A plaintiff seeking to impose liability for a design defect must demonstrate the following:

(1) the product, as designed, posed a substantial likelihood of harm; (2) it was feasible to design

the product in a safer manner; and (3) the defective design was a substantial factor in causing

plaintiff's injury.  *Maxwell v. Howmedica Osteonics Corp.*, 713 F. Supp. 2d 84, 90 (N.D.N.Y.

2010) (Suddaby, J.); *Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 403 (S.D.N.Y. 2013).

"Taken together, the first two prongs form a standard known as the 'risk-utility test.'" *Maxwell*,

713 F. Supp. 2d at 91 (citing *Cuntan v. Hitachi Koki USA, Ltd.*, 06-CV-3898, 2009 WL 3334364,

at *5 [E.D.N.Y. Oct. 15, 2009]).  "This standard is used to determine whether a product, as

designed, is 'unreasonably dangerous.'" *Id.* "There must be something wrong with the product,

and if nothing is wrong there will be no liability." *Galletta v. Valmet, Inc.*, 04-CV-0313, 2007

WL 963288, at *4 (N.D.N.Y. Mar. 30, 2007) (Mordue, J.).

It is not enough, however, to demonstrate that a product is dangerous.  *Cuntan*, 2009 WL

3334364, at *5.  A plaintiff must engage in

---

[7]        In New York, "'[i]n a design defect case, there is almost no difference between a *prima facie* case in negligence and one in strict liability.'" *Rogers v. Westfalia Assoc. Tech., Inc.*, 485 F. Supp. 2d 121, 126 (N.D.N.Y. 2007) (Sharpe, J.) (quoting *Bah v. Nordson Corp.*, 00-CV-9060, 2005 WL 1813023, at *12 [S.D.N.Y. Aug. 1, 2005]); *Pinello v. Andreas Stihl Ag & Co. KG*, 08-CV-0452, 2011 WL 1302223, at *16 (N.D.N.Y. Mar. 31, 2011) (Kahn, J.) (noting that "New York courts generally consider strict products liability and negligence claims to be 'functionally synonymous'").  Thus, the Court will address Plaintiffs' negligence and strict liability design defect claims together.

an inquiry into such factors as [the following]: (1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product–that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

*Id.* (quoting *Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 330 [E.D.N.Y. 2002]).  "A plaintiff is not required to introduce proof on all of these factors, as relevance of each factor will vary from case to case, and the factors interact with one another."  *Guarascio v. Drake Assoc. Inc.*, 582 F. Supp. 2d 459, 463 (S.D.N.Y. 2008).  "At a minimum, however, the plaintiff, in order to make out a prima facie case (and to raise a genuine issue of fact when confronted with a motion for summary judgment), must present some admissible evidence that there exists a technologically feasible and commercially practicable alternative design . . . ."  *Guarascio*, 582 F. Supp. 2d at 463; *Cuntan*, 2009 WL 3334364, at *5 ("[A] plaintiff must establish not only that a different design would have led to improved safety, but also that adopting such a design would be 'economically and technically feasible.'").

Generally, under New York law, a plaintiff seeking to establish a design defect is required to provide expert testimony as to the feasibility and efficacy of alternative designs.  *Cuntan*, 2009 WL 3334364, at *6 (collecting cases).  In particular, unless a reasonable alternative design is both obvious to and understandable by a layperson, an expert is needed.  *Guarascio*, 582 F. Supp. 2d at 463.  As a result, "New York courts uniformly rule that competent, non-conclusory expert testimony is needed in cases involving complex design issues."  *Guarascio*, 582 F. Supp. 2d at

463 (collecting cases). Experts can prove the feasibility and efficacy of alternative designs either by (1) showing, "through testing and construction of a prototype, that such an alternative design is within the realm of practical engineering feasibility," or (2) identifying "makers of similar equipment who have already put into use the alternative design." *Rypkema v. Time Mfg. Co.* 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003). "Despite this standard, there is no specific evidence a plaintiff must submit, although 'unsupported, conclusory evidence on the technological and economic feasibility of a safer design is insufficient.'" *Mathis-Kay v. McNeilus Truck & Mfg., Inc.*, 06-CV-0815, 2011 WL 4498386, at *7 (W.D.N.Y. Sept. 27, 2011) (quoting *Ferracane v. United States*, 02-CV-1037, 2007 WL 316570, at *5 [E.D.N.Y. Jan. 30, 2007]).

In the present case, Plaintiffs' expert, Thomas Grafe, P.E., opined that the dome suffered from several design defects. For instance, Mr. Grafe opined that the dome's height-to-width ratio was not in compliance with ASI-77. Mr. Grafe states that ASI-77 requires a height-to-width ratio between .3 and .5. (Dkt. No. 65, Attach. 2, ¶ 18 [Grafe Aff.].) According to Mr. Grafe, "[t]he high end, .5, is typically used in a high snow location to provide a steeper slope for snow to slide off. In this case, the subject structure is located in a low wind and high snow location, yet was designed at the flattest possible profile with a height to width ratio of .30." (*Id.*) Mr. Grafe further states that the longitudinal cables that were used were too short by several feet. (*Id.* at ¶ 19.) As a result, "[t]his likely created an even flatter profile than the .30 height to width ratio for which it was designed. Less than .30 is out of the proper design range." Mr. Grafe appears to have confirmed this himself by visiting the site in 2013, approximately two years after the dome's collapse. While there, Mr. Grafe states, "I measured the height at the center to be 66 feet 4 inches. This produces a height to width ratio of less than the minimum .30." (*Id.*)

In light of Mr. Schmidt's testimony that this was the largest structure he had designed at the time, Mr. Grafe states that "[it] is quite obvious that a larger structure has a larger area at the top that is nearly flat and can accumulate snow. Yet, the structure was designed with the flattest possible height to width ratio, in a high snow area. This fact alone establishes that the Dome was defectively designed." (*Id.* at ¶ 20.) Mr. Grafe also takes issue with the placement of the longitudinal cables, which caused documented occurrences of snow build on the ADSC dome and prevented the dome to shed snow. (*Id.* at ¶¶ 21-22.)

Finally, Mr. Grafe also takes issue with the design of the dome's heating system. Mr. Grafe states that the ASI manual requires the difference in temperature from the floor to the crown of the structure should be an increase of 0.5°F for every foot of height. (*Id.* at ¶ 9.) Mr. Grafe opines that, in this case, the temperature at the crown of the ADSC dome should be 34°F higher than the temperature at the floor. (*Id.*) However, according to Mr. Miller, a thermometer hoisted to the top of the inside of the dome never showed a differential temperature from the floor to the crown of more than 12°F. (*Id.*) Based upon this testimony, Mr. Grafe opines that "[t]his indicates either an incorrect assumption of the amount of stratification used in the design or improper design of the heating system." (*Id.*)

Based upon the opinions expressed in Mr. Grafe's affidavit, Mr. Grafe offers the following opinion with respect to alternative designs:

> Moreover, there are several feasible design alternatives that could have been employed by the Farley Group to avoid the Dome's collapse. For example, the Farley Group could (and should have) designed a Dome with a steeper height to width ratio. Similarly, the Farley Group could (and should have) designed a smaller structure so as to avoid snow accumulation on the Dome's excessively and unnecessarily flattened roof. Additionally, the

> Farley Group could (and should have) designed the Dome with longitudinal cables of a proper length, and could have placed those cables in such a manner that would avoid ice and snow being lodged behind them (such as being placed in the interior of the Dome's fabric).

(*Id*. at ¶ 32.)

In expressing this opinion, Mr. Grafe has failed to demonstrate the feasibility and efficacy of these alternative designs through his own testing or identifying other dome manufacturers that utilize these designs. For instance, with respect to Mr. Grafe's opinion regarding the dome's heating system, Mr. Grafe relied upon uncited deposition testimony from Mr. Miller, did not conduct his own tests or observations to verify Mr. Miller's claims, and did not indicate, with any specificity, that the heating system should have been designed with a higher BTU output or that the alleged lower temperatures were due to a specific defect.

Similarly, Mr. Grafe does not offer any support regarding the feasibility of placing the longitudinal cables in the interior of the dome or that other dome manufacturers have done so in their designs. Nor does Mr. Grafe offer any support for his opinion that Farley could have designed the dome with a steeper height-to-width ratio without significantly compromising the rest of the design. Specifically, Mr. Grafe does not offer an opinion as to what the proper height-to-width ratio should have been for a dome in the Queensbury area. Moreover, Mr. Grafe does not opine as to the costs associated with a steeper design, such as up-front and operating costs.[8]

---

[8] The Restatement provides an illustration that highlights the flaws of Mr. Grafe's opinion regarding the size of the dome. Restatement (Third) of Torts: Prod. Liab. § 2 cmt. f, illus. 9 (1998). Illustration number nine to comment "f," describes a purchaser of a compact car who suffered serious injuries after getting into an accident. The purchaser brings a products liability claim on the basis that the car is defective in that it does not offer the same level of crashworthiness as does a full-size automobile. Plaintiff, however, cannot identify a specific feature of the car that could have been designed differently so as to be safer without increasing its size and substantially reducing its desirable

Granted, Underwriters argue in their memorandum of law that, "[a]s a matter of common sense, building a smaller structure would have had the likely result of decreasing the price of the Dome" and that "[i]t does not appear that designing and constructing a Dome with a steeper height-to-width ratio would have the effect of significantly increasing the Dome's price"; however, such arguments are conclusory and not based on reliable evidence. (Dkt. No. 66, at 6-7 [Underwriters' Opp'n Mem. of Law].) Once again, this is a large and sophisticated product. Therefore, it would be impermissible to assume, "as a matter of common sense," that changing the dome's design to make it smaller would automatically be less expensive.

Finally, although Mr. Miller submitted an affidavit containing the results of Internet research he conducted, which purportedly demonstrate that other dome manufacturers utilize designs that can withstand specific snow loads, such evidence lacks probative value. (Dkt. No. 69, Attach. 3 [Miller Aff.].) Specifically, the attachments to Mr. Miller's affidavit are marketing materials from Defendant's various competitors. Although the documents state that the respective designs can withstand various snow loads, no calculations or other information is provided regarding the designs. Nor do any of these materials state that the designs can withstand a ground snow load of 70 PSF, which is the requirement for a structure erected in Queensbury, New York. Nonetheless, under the circumstances, advertising materials from Farley's competitors, which state that their designs can withstand specific snow loads, without

---

characteristics of lower cost and lower fuel economy. Therefore, "[Plaintiff] has not established a defect within the meaning Subsection (b)." Similarly, here, Mr. Grafe suggests the dome should have been designed smaller and/or with a steeper height-to-width ratio but does not offer an opinion regarding the costs involved with these design modifications or the costs associated with operating costs such as how much more expensive it would be to heat and inflate a dome with a steeper design. Nor does he take into account that Mr. Miller specifically wanted a large dome.

any additional information (including, but not limited to, cost), is insufficient to raise a genuine

dispute of material fact with respect to whether Defendant could have used an alternative design

that was both technologically feasible and commercially practicable.  Accordingly, because

Underwriters have failed to offer sufficient evidence regarding a feasible alternative design, the

claim must be dismissed.  *See In re Fosamax Prods. Liab. Litig.*, 924 F. Supp. 2d 477, 485

(S.D.N.Y. 2013) (stating that, "[t]o recover under a theory of strict products liability for sale of a

defectively designed product, 'it is well established that a plaintiff must plead and prove that

there was a feasible design alternative that would have made the product safer.'") (citations

omitted).

**F.      Whether a Genuine Dispute of Material Fact Exists Regarding Underwriters'
         Claim for Failure to Warn**

After carefully considering the matter, the Court answers this question in the negative for

the reasons stated in Defendant's declaration in support of its motion and Defendant's

memorandum of law.  (Dkt. No. 58, ¶¶ 101-15 [Bundschuh Decl.]; Dkt. No. 59, at 6-7 [Def.'s

Mem. of Law].)  To those reasons, the Court adds the following analysis.

The elements of a failure-to-warn claim are the same as those of a strict liability claim

and a negligence claim.  *Fane v. Zimmer*, 927 F.2d 124, 130 (2d Cir. 1991); *Marshall v.

Sheldahl, Inc.*, 150 F. Supp. 2d 400 n.5 (N.D.N.Y. 2001); *Engler v. MTD Prods., Inc.*, 13-CV-

0575, 2015 WL 900126, at *17 (N.D.N.Y. Mar. 2, 2015) (Hummel, M.J.).  To prove a prima

facie case for a failure-to-warn claim under New York law, a plaintiff must demonstrate that (1)

the manufacturer had a duty to warn, (2) the danger resulted from a foreseeable use about which

the manufacturer knew or should have know, and (3) the manufacturer's failure to warn of the

danger was the proximate cause of the plaintiff's injury. *Gunn v. Hytrol Conveyor Co., Inc.*, 10-CV-0043, 2013 WL 2249241, at *11 (E.D.N.Y. May 22, 2013) (citing *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 84 [S.D.N.Y. 2001]). Further, a plaintiff does not have the burden, at the summary judgment stage, to show that an adequate warning would have prevented his injury. *Liriano v. Hobart Corp.*, 170 F.3d 264, 271 (2d Cir. 1999). Indeed, "[t]he adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997) (quoting *Beyrle v. Finneron*, 199 A.D.2d 1022, 1023 [N.Y. App. Div. 4th Dept. 1993]).

However, this District has recognized two situations wherein failure-to-warn claims can be decided as a matter of law: "(1) where the injured party was fully aware of the hazard through general knowledge, observation or common sense; and (2) where the danger at issue falls within the limited class of hazards [that] need not be warned of as a matter of law because they are patently dangerous or pose open and obvious risks." *Rogers*, 485 F. Supp. 2d at 129 (citations omitted). Furthermore, a plaintiff's failure to read a warning is not dispositive. *Anderson v. Hedstrom Corp.*, 76 F. Supp. 2d 422, 445 (S.D.N.Y. 1999). A plaintiff may argue that "the warnings, in addition to being substantively inadequate, were insufficiently conspicuous or prominent and, thus, be able to overcome his or her failure to read them." *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 181 (E.D.N.Y. 2008).

Here, it is undisputed that Mr. Miller knew of the danger associated with allowing snow to accumulate on top of the dome. Mr. Miller read the dome's Operation and Maintenance Instructions, including the section titled "Snow Accumulation" and "Emergency Procedures,"

and discussed snow accumulation with other dome owners while conducting his own research prior to purchasing a dome. Although apparently no warnings were explicitly provided to Mr. Miller regarding the possibility that manual snow removal may be required at the time of his purchase, Mr. Miller was subsequently informed of this possibility in November 2010, which was before the dome's collapse. Accordingly, any failure to warn about the possibility for manual snow removal at the outset cannot be considered a proximate cause of the accident.

Finally, Underwriters' argument that Defendant failed to warn ADSC about the dome's actual minimum snow load capacity is also unpersuasive. Once again, it is undisputed that Mr. Miller was aware of the dangers associated with snow accumulation on top of the dome. Therefore, it was incumbent upon him to ensure that snow did not gradually accumulate. Underwriters' argument that Mr. Miller would have requested assistance sooner had he known that the dome could not withstand a 45 PSF snow load is entirely speculative and insufficient to raise a genuine dispute of material fact. In fact, Mr. Miller testified that he observed snow accumulating on the dome two to three weeks before the collapse. (Dkt. No. 58, Attach. 8, at 293:13-17.) Mr. Miller also observed the dome dishing approximately one week before the collapse when, in Mr. Miller's opinion, "it became a significant issue" based upon his past experience with other snow buildups on the dome. (*Id.* at 294:22-295:14.) It was at that point that Mr. Miller contacted Farley. (*Id.* at 295:15-17.) Nothing from this testimony suggests that Mr. Miller would have contacted Defendant any sooner, because Mr. Miller contacted Farley as soon as he developed significant concerns regarding the snow accumulation. Therefore, any alleged failure to advise or warn ADSC regarding the dome's actual minimum snow load capacity cannot be considered the proximate cause of the accident.

G.      **Defendant's Challenge to the Admissibility of Thomas Grafe's Expert Opinions**

In light of the above holdings, the Court need not, and will not, consider the merits of Defendant's arguments in its' reply papers regarding Mr. Grafe's proposed opinions.  More specifically, because the Court did not rely upon Mr. Grafe's opinions in reaching its decision regarding Plaintiffs' negligent misrepresentation and/or advice claims, those arguments are moot. Furthermore, the Court did not consider the thirty pages of "non-testimonial" exhibits attached to Defendant's reply.

IV.     **CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment is denied with respect to Plaintiffs' claims for negligent misrepresentation and/or advice.  However, Defendant's motion for summary judgment is granted with respect to Plaintiffs' remaining claims.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 56) is **<u>GRANTED</u> in part** and **<u>DENIED</u> in part** as set forth in Part IV of this Decision and Order such that **SURVIVING** Defendant's motion are Plaintiffs' claims for negligent misrepresentation and/or advice; it is further

**ORDERED** that counsel are directed to appear on **OCTOBER 28, 2015** at 11:00 a.m. in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than

**OCTOBER 9, 2015** , and the parties are directed to engage in meaningful settlement

negotiations prior to the conference.  In the event that counsel feel settlement is unlikely, counsel

may request to participate via telephone conference for the limited purpose of scheduling a trial

date by electronically filing a letter request at least one week prior to the scheduled conference.

Dated:       September 23, 2015
              Syracuse, New York

Hon. Glenn T. Suddaby
Chief, U.S. District Judge